**William JORDAN et al.**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Appellant.**

No. 77–1240.

United States Court of Appeals, District of Columbia Circuit.

Argued 6 April 1978.

Decided 31 Oct. 1978.

Hamilton P. Fox, III, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Carl S. Rauh, Principal Asst. U. S. Atty., John A. Terry, Robert N. Ford and Joseph Guerrieri, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Victor H. Kramer, Washington, D. C., with whom Charles E. Hill, Washington, D. C., and Judy Sello, Washington, D. C., were on the brief, for appellee.

Also Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellant.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

Concurring opinion filed by BAZELON, Circuit Judge.

LEVENTHAL, Circuit Judge, joined by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring.

Dissenting opinion filed by MacKINNON, Circuit Judge.

### OUTLINE OF THE OPINION

|  |  | Page |
|---|---|---|
| Introduction | | 755 |
| I. | BACKGROUND | 755 |
| | A. Statutory Framework | 755 |
| | B. Factual and Procedural History | 757 |
| II. | DISCUSSION OF THE ASSERTED BASIS OF NON–DISCLOSURE | 759 |
| | A. Appellant's (a)(2) Claim | 759 |
| | B. Appellant's (b)(2) Claim | 763 |
| |    1. Statutory Language | 763 |
| |    2. Legislative History | 767 |
| | C. Appellant's (b)(5) Claim | 771 |
| |    1. The Deliberative Process Privilege Claim | 772 |
| |    2. The Attorney Work Product Claim | 774 |
| |    3. The Prosecutorial Discretion Privilege | 776 |
| | D. Appellant's (b)(7) Claim | 779 |
| III. | CONCLUSION | 780 |

### WILKEY, Circuit Judge:

This case arises under the Freedom of Information Act (the "Act").[1] Appellant is the United States Department of Justice; appellee is William Jordan, a law student at Georgetown University Law Center. The records at issue are two documents relating to the exercise of prosecutorial discretion by the United States Attorney for the District of Columbia and his assistants. The district court held that the Department of Justice is required to index these documents and to make them available for public inspection and copying under subsection (a)(2) of the Act.[2]

While we agree with the district court that these documents are releasable under the Act, we do not agree that they are releasable under subsection (a)(2). Rather, we conclude that these documents are disclosable under subsection (a)(3). We also find that the statutory exemptions from disclosure *timely* claimed by the Department of Justice in this case—Exemptions 2 and 5—are inapplicable. Finally, we hold that Exemption 7, which appellant invoked for the first time on this appeal, was not timely raised. Accordingly, the Order and Judgment of the district court is affirmed as modified.

## I.  BACKGROUND

### A.  *Statutory Framework*

Congress enacted the Freedom of Information Act for the express purpose of increasing disclosure of government records. It was designed "to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny."[3] According to the Senate Report accompanying the original version of FOIA passed in 1966,[4] the statute reflects "a general philosophy of full agency disclosure" and protects "the public's right to know the operations of its government."[5] Congress amended the statute in 1974[6] to strengthen the disclosure requirement. The House Report on the amendments noted that "[t]his bill seeks to reach the goal of more efficient, prompt, and full disclosure of information."[7]

The FOIA is codified at 5 U.S.C. § 552, and its structure is by now familiar. The first part of the statute—subsection (a)—mandates the disclosure of records by government agencies. It is divided into

---

1. 5 U.S.C. § 552 (1976).

2. U.S. District Judge Waddy's unpublished "Order and Judgment" of 18 January 1977, Civil Action No. 76–0276, is reproduced at Appendix (App.), to parties' briefs at 76–77.

3. *Rose v. Department of Air Force*, 495 F.2d 261, 263 (2d Cir.1974), *aff'd*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

4. Pub.L. No. 89–487, 80 Stat. 250 (1966).

5. S.Rep. No. 813, 89th Cong., 1st Sess. 3, 8 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418, *reprinted in Senate Comm. on the Judiciary*, 93d Cong., 2d Sess., *Freedom of Information Act Source Book: Legislative Materials, Cases, Articles* 38, 43 (Comm. Print. 1974).

6. Pub.L. No. 93–502, 88 Stat. 1561 (1974).

7. H.R.Rep. No. 93–876, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6267, 6271.

three parts, setting forth *three methods* by which agencies must make information available to the public. Paragraph (a)(1), not otherwise relevant in this case, requires that certain enumerated types of material be published in the Federal Register. Paragraph (a)(2) requires that certain other types of material be indexed and made available for public inspection and copying. The materials encompassed by paragraph (2) are automatically available for public inspection; no demand is necessary. It was into this category that the district court found that the materials in this case fell. Specifically, this paragraph provides in pertinent part:

> (2) Each agency, in accordance with published rules, shall make available for public inspection and copying—
>
> . . . . .
>
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; and
> (C) administrative staff manuals and instructions to staff that affect a member of the public. . . .

Finally, and most comprehensively, paragraph (a)(3) requires disclosure, on demand, of *all other reasonably described records* not already released under paragraphs (a)(1) and (a)(2). It provides in pertinent part:

> (3) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describe such records and (B) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person.

Thus, these three paragraphs—(a)(1), (a)(2), and (a)(3)—are alternative disclosure channels, and paragraph (a)(3) serves as a catch-all provision, mandating disclosure of material that does not fall within the categories set forth in the preceding two paragraphs.

Of course, FOIA does not command the disclosure of *all* government records. Congress realized that *some* secrecy is necessary for the government to function. Consequently, the second part of the statute—subsection (b)—enumerates nine categories of records that are exempt from the Act's disclosure requirement. These limited exceptions, however, "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." [8] The nine enumerated exemptions are "exclusive" [9] and "must be narrowly construed." [10] The exemptions relevant to the present case are as follows:

> (b) This section does not apply to matters that are—
>
> \* \* \* \* \* \*
>
> (2) related solely to the internal personnel rules and practices of an agency;
>
> \* \* \* \* \* \*
>
> (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
>
> \* \* \* \* \* \*
>
> (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the

8. *Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976).

9. *EPA v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

10. *Department of Air Force v. Rose,* 425 U.S. at 361, 96 S.Ct. 1592. *See Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 343, 484 F.2d 820, 823 (1973) *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *Vaughn v. Rosen,* 173 U.S. App.D.C. 187, 193, 523 F.2d 1136, 1142 (1975); *Soucie v. David,* 145 U.S.App.D.C. 144, 157, 448 F.2d 1067, 1080 (1971).

case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

## B. *Factual and Procedural History*

On 13 November 1975 appellee Jordan filed an FOIA request with the Deputy Attorney General, seeking access to the charging manuals, rules, and guidelines used by the Office of the United States Attorney for the District of Columbia in deciding (1) "which persons should be prosecuted for suspected violations of criminal laws in the District of Columbia, and/or the manner in which prosecutorial discretion will be exercised", and (2) "which persons suspected of violations of criminal laws will be eligible for rehabilitation programs which divert such individuals from criminal prosecution." [11] The Department of Justice denied Jordan's request on 3 February 1976, claiming that the requested documents were exempt from disclosure by subsection (b)(5) of the Act.[12] Jordan filed this suit in the district court on 19 February 1976, seeking review of the Department's action.[13]

In the course of discovery it was determined that there are at least 30 documents in the Office of the United States Attorney for the District of Columbia that fall within the description of materials requested by Jordan.[14] However, only two of these documents are pertinent in this case.

The first pertinent document is the "Papering and Screening Manual for the Superior Court Division" (the Manual). Most of the information contained in this 178-page Manual is administrative, concerning such matters as payment of witnesses, papering procedures, sample forms, office organization, and the like.[15] However, there are ten paragraphs in the Manual that contain specific guidelines and criteria which Assistant United States Attorneys are expected to consider in handling certain offenses. Specifically, the guidelines contained in these ten paragraphs cover the following subjects: (1) situations in which non-prosecution is warranted for certain sex-related offenses (paragraph No. 316); (2) situations in which selective prosecution is warranted for certain narcotic and larceny offenses depending upon quantitative considerations, i. e. the amount of narcotics possessed or value of property stolen (paragraphs No. 332a and 333); (3) guidelines for the selection of appropriate charges from among available alternative charges depending upon certain factual considerations, e. g., the nature and extent of injuries and the type of weapon involved (paragraphs No. 307a, 307b, 308b, 327f); (4) recommended criteria in considering eligibility for first offender treatment (paragraph No. 360a); and (5) situations warranting certain internal prosecutorial action, e. g., the initiation of a five-day hold under D.C.Code, § 23–1322(e) or reduction of charges brought against defendants who are police informants (paragraphs No. 221 and 350).[16]

The second pertinent document is a 6-page memorandum entitled "Pre-Trial Diversion Guidelines" (the "Guidelines"). These guidelines set forth the criteria for eligibility in three separate pre-trial diversion programs. One of the three programs discussed in the guidelines is the First Offender Treatment (FOT) program, and the

11. Letter of 13 November 1975 from Victor Kramer (counsel for appellee) to Deputy Attorney General, App. 8–9.

12. Letter of 3 February 1976 from Wm. Gray, Director of Executive Office for U.S. Attorneys, to Victor Kramer, App. 12–13.

13. Complaint for Declaratory and Injunctive Relief, App. 2–7.

14. Defendant's Answers to Plaintiffs' Interrogatories, App. 26–35.

15. Affidavit of Earl J. Silbert, United States Attorney for the District of Columbia, App. 40–46.

16. *Id.* at 43.

criteria for eligibility in this program are discussed on *each* of the Guideline's six pages.[17]

On 24 March 1976 Jordan moved for partial summary judgment with respect to (1) the entire "Papering and Screening Manual", and (2) the FOT Guidelines contained in the "Pre-Trial Diversion Guidelines". Jordan contended that the Department of Justice was required by subsection (a)(2) of the Act to index both of these documents and make them "available for public inspection and copying" as "statements of policy . . . adopted by the agency" under (a)(2)(B) and as "administrative staff manuals and instructions to staff" under (a)(2)(C).

On 30 April 1976 the U.S. Attorney for the District of Columbia wrote Jordan's counsel, stating:

I have determined that the entire 178-page Papering & Screening Manual may be disclosed to you for your inspection and copying, subject only to the excision of ten paragraphs in which I believe there exists, in addition to valid statutory exemptions, a present vital governmental interest not to disclose. With regard to First Offender Treatment (FOT) guidelines, Pre-Trial Diversion Programs are treated in a document containing six pages, on each of which is discussed FOT. The same exemptions are claimed as to this document as are claimed regarding the ten excised paragraphs of the Papering & Screening Manual. These claims for exemption will be dealt with in Defendant's Cross-Motion for Partial Summary Judgment.[18]

Subsequently, the Department of Justice filed its cross-motion for partial summary judgment with respect to the 10 withheld paragraphs in the Manual and the FOT guidelines, claiming that this material was covered by subsection (b)(2), which exempts from disclosure matters "related solely to internal personnel rules and practices of an agency", and by subsection (b)(5), which exempts from disclosure "intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The Department also stressed what it viewed as the pernicious consequences that would result from disclosure:

Public disclosure of these materials would alert members of the public to those situations, persons, and offenses for which prosecution is withheld, selectively applied, or disposed of by pre-trial diversion. Individuals could then successfully exploit these policies by committing crimes within these select categories, thereby escaping prosecution. For example, publication of a policy of non-prosecution (or prosecution at a lesser degree of seriousness) for possession of certain quantities of specific narcotic drugs would serve only to encourage dealers and users of narcotics to carry lesser quantities of the drug than those specified in our guidelines. A similar result would obtain if our internal guidelines regarding monetary tolerances (property value theft minimums used in larceny cases to determine whether prosecution is warranted) were released since an offender could avoid full prosecution merely by stealing property valued at less than our *de minimus* standards. Obviously, the revelation of this kind of information would serve no legitimate public purpose and would ultimately result in the rescission of many of these guidelines and termination of our FOT program.[19]

The case was argued before District Judge Waddy on 13 January 1976. Judge Waddy ruled from the bench, and, on the following day, the district court issued a written Order and Judgment that granted appellee's motion for summary judgment and declared that the Manual and the Guidelines were releasable under subsection (a)(2) of the Act. The Department of Jus-

---

17. *Id.* at 42.

18. Letter of 30 April 1976 from U.S. Attorney Silbert to Victor Kramer, App. 36.

19. Affidavit of Earl Silbert, App. 45.

tice appeals from this Order and Judgment.[20]

## II. DISCUSSION OF THE ASSERTED BASES OF NON–DISCLOSURE

The Department of Justice contends on this appeal that the withheld portions of the Manual and the FOT Guidelines are exempt from mandatory public disclosure under the FOIA. It relies on four specific provisions in the Act: paragraph (a)(2), and exemptions (b)(2), (b)(5), and (b)(7). We shall examine these claims *seriatim.*

### A. *Appellant's (a)(2) Claim*

■ The district court held that the Manual and Guidelines sought by appellee Jordan were releasable under paragraph (a)(2) of the Act. As we have already noted, that paragraph requires that certain enumerated materials, including "administrative staff manuals", be indexed and made available for public inspection and copying even without a demand. The Department of Justice argues that this ruling by the district court was erroneous. Its contention is that the materials at issue in this case are *not* "administrative staff manuals" but rather are "law-enforcement manuals" and, as such, are *not* releasable under paragraph (a)(2).

The Department's position finds ample support in the legislative history. The original version of FOIA introduced into the Senate did not contain the word "administrative" before the words "staff manuals" in paragraph (a)(2); clause (C) of that paragraph referred only to "staff manuals." [21] The Senate Judiciary Committee inserted the term "administrative", explaining this modification in its Report:

> The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters rather than to law enforcement matters protects the *traditional confidential nature of instructions to government personnel prosecuting violations of law in court*, while permitting a public examination of the basis for administrative action.[22]

The House report explained this amendment in similar terms:

> [A]n agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines for the staff in auditing or inspection procedures, or in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases.[23]

It is evident, then, that by inserting the word "administrative" in paragraph (a)(2), Congress intended to make a distinction between "administrative" manuals, on the one hand, and "law enforcement" manuals, on the other. It is also clear that Congress intended that the former material should be subject to the indexing and public inspection and copying requirements of paragraph (a)(2) and that the latter material should *not* be included within the coverage of this paragraph.

The line between these two categories— "administrative" matters and "law enforcement" matters—is not exactly clear, and it

20. During pendency of the appeal and prior to oral argument, the Department of Justice "out of an abundance of caution to insure [its] compliance with the FOIA" disclosed to appellee two of the ten withheld paragraphs from the Papering and Screening Manual—paragraph no. 221, dealing with five-day-hold requests, and paragraph no. 350, dealing with charges brought against police informants. These materials were disclosed to appellee by letter of 22 June 1977. Thus, presently there remain at issue *eight paragraphs* of the 178-page "Papering and Screening Manual" together with the entire six-page "Pre-trial Diversion Guidelines."

21. S. 1160, 89th Cong., 1st Sess. § 3(b), (c), [1966] U.S.Code Cong. & Admin.News, p. 2418, 111 Cong.Rec. 2719 (daily ed. 17 Feb. 1965).

22. S.Rep. No. 813, 89th Cong., 1st Sess. at 2 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418 (emphasis added).

23. H.R.Rep. No. 1497, 89th Cong., 2d Sess. at 7–8 (1965), [1966] U.S.Code Cong. & Admin. News, pp. 2424–2425.

may be difficult to draw in some cases.[24] However, in this case, it is clear enough. Both the Senate and House reports specifically indicate that instructions to Government personnel prosecuting cases in court are "law enforcement" matters and, hence, outside the scope of paragraph (a)(2). Manifestly, the documents here at issue—both the Manual and the Guidelines—fall within this description of non-covered material. Therefore, we conclude that the withheld portions of the Manual and the FOT Guidelines are *not* subject to disclosure under paragraph (a)(2).[25] We agree with the Department of Justice that the district court erred in this respect.

However, the mere fact that the material requested by appellee does not fall within the scope of paragraph (a)(2) does not mean that it is exempt from disclosure under the Act. As we have already noted, subsection (a) provides for three *different methods* of making information available to the public: (a)(1) requires certain matter to be published in the Federal Register; (a)(2) requires certain matter to be indexed and made available for public inspection and copying even without demand; and (a)(3) requires the release on demand of all reasonably described records that have not already been made available under (a)(1) or (a)(2). Thus, paragraph (a)(2) is but one of three *alternative* disclosure channels in the Act. If particular records, such as the Manual and Guidelines in this case, do not fall within the scope of (a)(2), it does not mean that such documents are not disclosable under

the Act. It means only that they are not subject to the particular indexing and public inspection and copying requirements of that paragraph; these same documents may nevertheless be covered by either (a)(1) or (a)(3). Indeed, (a)(3) is a catch-all provision, and virtually every agency record which does not fall within (a)(1) or (a)(2) is disclosable under (a)(3) unless it falls within one of the nine exemptions in subsection (b).

■ In the instant case we have already concluded that the Manual and Guidelines sought by appellee Jordan are not covered by (a)(2); nor do they appear to fall within the categories of materials enumerated in (a)(1). However, they ·clearly fall within the scope of (a)(3). There is no doubt that these documents are "agency records"; there is no doubt that appellee Jordan has requested these documents "in accordance with the rules" of the Department of Justice; there is no doubt that appellee Jordan's request "reasonably describes" the records sought; and it is clear that these documents have not already been made available under (a)(1) or (a)(2). Under these circumstances, then, the Department of Justice must make the Manual and Guidelines "promptly available" to Jordan under paragraph (a)(3), unless these documents are exempted from disclosure by at least one of the nine specific exemptions delineated in subsection (b).

The Department of Justice strongly challenges this conclusion, contending that staff

---

24. *See Hawkes v. Internal Revenue Service,* 467 F.2d 787 (6th Cir. 1972).

25. While the limiting word "administrative" is used in clause (C) of paragraph (a)(2), it obviously excludes "law enforcement" manuals from the coverage of paragraph (a)(2) as a whole. In other words, we cannot read the phrase "statements of policy" in clause (B) as covering law enforcement manuals which have been specifically excluded from the scope of paragraph (a)(2) by clause (C). Paragraph (a)(2) sets forth a *single method* for releasing agency records to the public, namely, indexing and automatic release for public inspection and copying. Clauses (A), (B), and (C) list three types of documents subject to this mode of disclosure. If Congress has specifically exclud-

ed a particular type of document from the coverage of clause (C), it would be wholly inconsistent to read either clauses (A) or (B) as embracing that type of document. This does not hold true, however, for types of records excluded under separate numbered paragraphs; since each paragraph mandates a *different* mode of disclosure, the exclusion of certain matter from the scope of one paragraph means only that such matter is not to be released in that particular mode; it does not foreclose the possibility of disclosure under a separate paragraph. The purpose of having different modes of disclosure is to deal with different type documents in different ways. See discussion at pages ——–—— of 192 U.S.App.D.C., at pages 755–756 of 591 F.2d *supra.*

manuals not disclosable under (a)(2) because they are "law enforcement manuals" are, as such, exempt from (a)(3) disclosure as well, regardless of whether any of the nine exemptions in subsection (b) applies. The Department reasons that the congressional policy evinced in (a)(2) of protecting law enforcement matters from disclosure would be frustrated if the same materials are releasable under (a)(3). It therefore asserts "that by excluding law enforcement manuals from the ambit of section (a)(2), Congress intended to exclude them from the ambit of the entire Act." [26] We believe that this position is untenable in view of the fundamental structure of the Act.

The three paragraphs in subsection (a) of the Act *are not exempting provisions. The only exemptions in the Act are to be found in subsection (b).* The nine specific exemptions set forth in that subsection are exclusive. As the Act is structured, then, an agency is not justified in withholding records from public disclosure unless those records fall within the specific terms of at least one of the nine exemptions in subsection (b). This is clear from both the statute's plain language and its legislative history. Subsection (c) of the Act, for example, provides that the FOIA

does not authorize withholding of information or limit the availability of records to the public, *except as specifically stated* . . . .[27]

The Senate Committee report states that the purpose of subsection (c) is to

make clear beyond doubt that *all materials* of the Government are to be made available to the public . . . *unless specifically allowed to be kept secret by one of the exemptions in subsection [(b)].*[28]

Moreover, paragraph (a)(4)(B), part of the 1974 amendments to the Act, provides that reviewing courts may examine withheld records *in camera*

to determine whether such records or any part thereof shall be withheld *under any of the exemptions set forth in subsection (b)* . . . .[29]

Even more compelling, the last sentence of subsection (b) clearly states that *only matters specifically exempted by that subsection* may be withheld by an agency:

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt *under this subsection.*[30]

We agree with the Senate that § 552(c), together with § 552(a)(4)(B) and § 552(b), does make the matter "clear beyond doubt." Finally, the case law confines the Act's exemptions to those enumerated in subsection (b).[31] As the Supreme Court noted in

---

**26.** Supplemental Memorandum for Appellant at 3.

**27.** 5 U.S.C. § 552(c).

**28.** S.Rep. No. 813, 89th Cong., 1st Sess. at 10 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418.

**29.** 5 U.S.C. § 552(a)(4)(B).

**30.** 5 U.S.C. § 552(b).

**31.** *Kent v. NLRB,* 530 F.2d 612 (5th Cir. 1976); *Caplan v. Bureau of Alcohol, Tobacco & Firearms,* 445 F.Supp. 699 (S.D.N.Y.1978) (holding that law enforcement manual excluded from coverage under (a)(2)(C) was still subject to disclosure under (a)(3)) ("In light of the clear statutory language, . . . legislative history, and judicial interpretations of the Act, we are constrained to reject the agency's theory that subsection (a)(2)(C)'s legislative history creates a restriction on disclosure beyond the nine exemptions enumerated in subsection (b)."); *Tax Analysts and Advocates v. Internal Revenue Service,* 362 F.Supp. 1298, 1306 (D.D.C.1973), *modified and remanded,* 164 U.S.App.D.C. 243, 505 F.2d 350 (1974) (holding IRS letter rulings subject to disclosure under (a)(3) even if not within scope of (a)(2)). *See Department of Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 136, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *EPA v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973) ("Subsection (b) of the Act creates nine exemptions from compelled disclosures. These exemptions are explicitly made exclusive . . . and are plainly intended to set up concrete, workable standards for determining whether particular material may be withheld or must be disclosed."); *Getman v. NLRB,* 146 U.S.App.D.C. 209, 450 F.2d 670 (1971); *Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970) ("The legislative plan creates a liberal disclosure requirement, limited

*N. L. R. B. v. Sears, Roebuck & Company,*[32] for example:

> As the Act is structured, virtually *every document* generated by an agency is available to the public in one form or another, *unless* it falls within one of the Act's nine exemptions. . . . [T]he disclosure obligation 'does not apply' to those documents described in the nine enumerated exempt categories listed in § 552(b).

It is thus clear that limitations in paragraph (a)(2) with respect to law enforcement manuals, do not "exempt" material from disclosure under paragraph (a)(3), since the only exemptions in the Act, as Congress has expressly declared, are in subsection (b). The nonapplicability of either (a)(1) or (a)(2) does not foreclose the possibility of disclosure under (a)(3), for otherwise (a)(3) has no purpose.

Still, the Justice Department contends that Congress' purpose in *excluding* law enforcement matters from (a)(2) would be completely defeated by *including* these same matters in (a)(3), and that in order to give effect to the limitations in (a)(2), we must read (a)(2)(C) as creating an exemption in addition to the nine in subsection (b). We recognize that this argument is not frivolous; however, we point out that it *does not necessarily follow* that Congress' purpose in limiting the scope of (a)(2) will be frustrated by giving full effect to (a)(3), for we must give some effect to Congress' purpose in defining three different modes of disclosure for different types of documents.

On the one hand, it *may be,* as appellant suggests, that Congress' purpose in excluding law enforcement matters from (a)(2) was to protect these matters from *all forms* of disclosure. In order for us to read the legislative history in this way, however, we would have to suppose that Congress made an egregious legislative error by placing what it intended to be an exemption in the wrong subsection of the Act, and we would also have to ignore the clear and repeated statements in the statute itself and in other parts of the legislative history that the Act permits withholding documents *only to the extent* that such documents fall within a specific exemption *in subsection (b).* We are reluctant to give ambiguous legislative history this much weight. As we recently stated concerning the FOIA: "Ambiguous inferences from the legislative history cannot supplant the clear mandate of the language of the statute." [33]

On the other hand, *it may be* that Congress *did not* intend to give *complete* protection to the "law enforcement" materials it excluded from (a)(2). Paragraphs (a)(2) and (a)(3) provide for different methods of disclosure: (a)(2) requires the public indexing of materials and their automatic release to the public; (a)(3) requires release only upon the filing of a request reasonably describing the material sought. In placing the limitation on the accessibility of law enforcement materials in paragraph (a)(2) rather than in subsection (b), it may be that Congress intended to extend *some,* but not *complete,* protection to these materials; that is, Congress intended to protect law enforcement manuals from automatic public indexing and disclosure under (a)(2) but not from disclosure on demand under (a)(3). This may be thought a somewhat peculiar regime and one that may not be in the public's interest, but it is not a wholly irrational one, and this reading of the legislative history of paragraph (a)(2) is at least consistent with the plain wording of the statute and other, less ambiguous, parts of the legislative history. We feel constrained to accept this interpretation in the absence of clearer guidance from the legislative branch: If Congress has made a mistake in drafting this law, Congress must repair it.

only by specific exemptions which are to be narrowly construed."). *But see City of Concord v. Ambrose,* 333 F.Supp. 958 (N.D.Cal. 1971).

**32.** 421 U.S. 132, 136–37, 95 S.Ct. 1504, 1509–10 (1975).

**33.** *Merrill v. Federal Open Market Committee,* 184 U.S.App.D.C. 203, 210–11, 565 F.2d 778, 785–86 (1977), *cert. granted,* 436 U.S. 917, 98 S.Ct. 2260, 56 L.Ed.2d 757 (1978).

In sum, then, we hold that the Manual and Guidelines sought by appellee Jordan in this case *are not* releasable under paragraph (a)(2) of the Act. However, these documents *are* releasable under paragraph (a)(3), unless they fall within at least one of the nine exemptions set forth in subsection (b). The Department has, in fact, claimed that three of these exemptions apply to the requested documents—(b)(2), (5) and (7). We shall now proceed to treat these claims in turn.

## B. *Appellant's (b)(2) Claim*

█ The Department of Justice contends that the withheld portions of the Manual and the FOT Guidelines are exempted from mandatory disclosure by subsection (b)(2). We think it is clear from the statutory language and the legislative history of subsection (b)(2) that this position is without merit.

### 1. *Statutory Language*

According to its terms, subsection (b)(2) exempts from disclosure matters "related solely to the internal personnel rules and practices of an agency." There are three key words in this short description of exempted material: "solely", "internal", and "personnel".

"Internal", as modifying or limiting "personal rules and practices of an agency", would seem to refer to those rules and practices that concern relations among the employees of an agency, as distinct from rules and practices that might relate to, or have a more direct impact upon, members of the public. The rules and practices by which an agency orders its *own* affairs among its *own* personnel would seem to invite little public interest in disclosure. Conversely, rules and practices that have a definite impact on the public would seem to be a more fit subject for disclosure to the public. The former might properly be described as "internal", the latter as "external" rules and practices. On this basis, the Manual and Guidelines sought by appellee should be more properly described as "external" rather than "internal", although this is not the decisive division.

"Personnel" is the real problem for the Government agency here seeking to avoid disclosure. It is almost impossible to look at this short, simple exemption on its face, "related solely to the internal personnel rules and practices of an agency," and say that this description was intended to cover the Manual and Guidelines here. The word "personnel" would normally connote matters relating to pay, pensions, vacations, hours of work, lunch hours, parking, etc.—precisely the kind of trivia that was indeed described by the Senate's comment on the coverage of this particular exemption.[34] Just why the statute should go to the trouble to include a special subsection exempting this trivia is not certain. But this is what the plain language of the statute points to, and it is confirmed by the Senate's comment, as will be seen below. The Manual or Guidelines of the type at issue are simply not "personnel" rules or practices.

Finally, the word "solely" emphasizes the limited scope of Exemption 2, whatever the other words are deciphered to mean.

It can only be concluded from the face of the statute that the Guidelines at issue here are not within the specific language of Exemption 2.

█ In *Ginsburg, Feldman & Bress v. FEA*,[35] the now vacated panel opinion of two judges came up with a novel reading of Exemption 2. It claimed that the phrases "internal personnel rules" and "practices of an agency" could be read disjunctively, with the former phrase referring to relations between the agency and its employees and with the latter phrase referring to operational conduct of the employees. On this appeal, for the first time since it has been dealing with the Freedom of Information Act, the Department of Justice has now

---

34. S.Rep. No. 813, 89th Cong., 2d Sess. 8 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418.

35. 192 U.S.App.D.C. ——, 591 F.2d 717 (1978).

adopted this reading of Exemption 2 [36] and argues that the Manual and Guidelines sought by appellee are matters relating to "practices of an agency" and are therefore exempt under this provision.[37]

This interpretation cannot be sustained. It is violative of basic rules of English grammar, contrary to the legislative history of the exemption, and incompatible with the general purpose of the Act. Indeed, every court which has considered the specific language of Exemption 2 has concluded, for good and sufficient reasons, that the phrase "internal personnel" modifies both "rules" and "practices".[38]

Grammatically, it is clear that "internal" modifies "practices". "Internal" is an adjective which requires completion by the prepositional clause "of an agency". Whatever is modified by "internal" must be internal *to something*. "Internal" is orphaned unless it relates to the clause "of an agency". It is basic grammar that *both nouns* bracketed by the word "internal" and the phrase "of an agency" are modified by "internal". Moreover, while it is conceivable that "personnel" applies only to "rules", the preferred construction is that it modifies both nouns in the dyad "rules and practices". If Congress intended to sever "practices" from "internal personnel rules", it would have preserved parallel construction by inserting the article "the" before the word "practices".

We need not rely solely on the *rules* of grammar to determine that Congress had no intention of exempting a general category of information relating to "practices of an agency". It is clear from the legislative *history* of this particular clause, with direct reference to its grammatical construction, that Congress intended the exemption to be read as a composite clause, covering only internal personnel matters.

The phrasing of Exemption 2 is traceable to Congressional dissatisfaction with the exemption from disclosure under former Section 3 of the Administrative Procedures Act of "any matter relating solely to the *internal management* of an agency." [39] Agencies had relied on this broad language in refusing to disclose matters "rang[ing] from the important to the insignificant." [40] The language "internal personnel rules and practices" was first used in a bill specifical-

---

**36.** Supplemental Memorandum for Appellant at 5.

**37.** From at least as early as 1958, the Department of Justice was continuously involved with Congress in hearings and comment on various drafts of proposed freedom of information legislation. In the 85th Congress the first major revision of the public information laws was introduced. No action was taken on these bills (H.R. 7174 and S. 2148) but in 1958 a statute was passed amending the Federal "housekeeping" statute so as to provide that the statute did not authorize the withholding of information from the public (Pub.L. 85–619, 72 Stat. 547). Various freedom of information bills were introduced in the 86th and 87th, but movement began in earnest during the 88th Congress with hearings on S. 1663. It was in the 89th Congress that the Department of Justice played a special role in the "construction" of Exemption 2. (*See* pages          of 192 U.S.App.D.C., pages 764–766 of 591 F.2d *infra*). Strange indeed it is that the interpretation now advocated by Judge MacKinnon in *Ginzburg* never occurred to the well-informed personnel at the Department during the 13-year period since enactment of the FOIA.

**38.** *Consumers Union of United States, Inc. v. Veterans Administration,* 301 F.Supp. 796, 800 (S.D.N.Y.1969), *appeal dismissed as moot,* 436 F.2d 1363 (2d Cir. 1971); *Benson v. General Services Administration,* 289 F.Supp. 590, 594 (W.D.Wash.1968), *aff'd on other grounds,* 415 F.2d 878 (9th Cir. 1969). *See Vaughn v. Rosen (Vaughn II),* 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975); *Stokes v. Brennan,* 476 F.2d 699 (5th Cir. 1973); *Hawkes v. Internal Revenue Service,* 467 F.2d 787 (6th Cir. 1972); *Stern v. Richardson,* 367 F.Supp. 1316 (D.D.C.1973).

Cases which have given a broad interpretation to Exemption 2 have not set "practices of an agency" apart from "internal personnel rules." *See Tietze v. Richardson,* 342 F.Supp. 610 (S.D.Tex.1972); *Cuneo v. Laird,* 338 F.Supp. 504 (D.D.C.1972), *rev'd on other grounds sub nom. Cuneo v. Schlesinger,* 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973), *cert. denied sub nom. Vaughn v. Rosen,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *City of Concord v. Ambrose,* 333 F.Supp. 958 (N.D. Cal.1971).

**39.** 5 U.S.C. § 1002 (1964) (emphasis added).

**40.** H.R.Rep. No. 1497, 89th Cong., 2d Sess. 5 (1966), [1966] U.S.Code Cong. & Admin.News, p. 2422.

ly designed to *narrow* the "internal management" exemption in former Section 3 of the APA. S. 1666, introduced in the 88th Congress, proposed an exemption for "internal management" only in the subsection of the bill requiring certain matters to be published in the Federal Register. In the subsection requiring agency rules, orders and records to be made available for public inspection, an exemption was proposed only for information related "solely to the internal personnel rules and practices of an agency." This distinction was highlighted in the Senate Report on S. 1666 by reference to the latter as "more tightly drawn" language.[41] The Freedom of Information bills introduced in the 89th Congress, including S. 1160 which became the law in 1966, dropped the "internal management" exemption altogether and carried over the "more tightly drawn" language of S. 1666 as a single exemption. Thus, as the Supreme Court concluded in *Department of the Air Force v. Rose*,[42] "the legislative history plainly evidences the congressional conclusion that the wording of Exemption 2, 'internal personnel rules and practices', was to have a narrower reach than the Administrative Procedure Act's exemption for 'internal management'". The Justice Department's interpretation of Exemption 2 which sets apart "practices of an agency" as an independent category of exempt information would be contrary to Congress' clear intention that this exemption be interpreted specifically and narrowly.

Even more convincingly, it is clear from both the House and Senate hearings on Freedom of Information legislation in the 89th Congress that everyone concerned in both the legislative and executive branches understood that the words "internal personnel" applied to all of Exemption 2. For example, on the first day of House hearings on H.R. 5012, Congressman John E. Moss, Chairman of the Foreign Operations and Government Information Subcommittee of the House Government Operations Committee, Benny L. Kass, counsel to the subcommittee, and Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, discussed the scope of the phrase "internal personnel rules and practices":[43]

Mr. Kass. Mr. Schlei, what is your interpretation of exemption No. 2? What information would fall under those records relating solely to the internal personnel rules and practices of an agency? How does your agency interpret that?

Mr. Schlei. Well, we were inclined to be critical of that exception because it did not seem to us actually that the personnel rules and practices of an agency, many of them, ought to be exempt. They ought to be public. How you handle various personnel problems and where somebody goes to complain if he is treated wrongly by his superior, and so on. All those things I would suppose should be public. They should be published somewhere. They should be up on a bulletin board.

And there are some personnel rules and practices that ought to be exempt, and I think that—let's see—

Mr. Kass. It is No. 2.

Mr. Schlei. And so that exception, it seemed to us, protected from disclosure things that did *not* need protection, as well as perhaps not going far enough as to some aspects of information that the Government gets about its employees.

Mr. Kass. Where an individual is, let's assume, fired from the agency—for cause we hope—would the facts and circumstances surrounding this discharge fall within the *personnel practices* of an agency as you read it?

Mr. Schlei. I should not think so, although you are talking here about records that are related to the "*practices*" of an agency, and conceivably a record, although it contained only a summary of

---

**41.** S.Rep. No. 1219, 88th Cong., 2d Sess. 12 (1964).

**42.** 425 U.S. at 363, 96 S.Ct. at 1600 (1976).

**43.** Federal Public Records Law Part I: Hearings on H.R. 5012, et al., before the Foreign Operations and Government Information Subcomm. of the House Comm. on Government Operations, 89th Cong., 1st Sess., 29–30 (30 March–5 April 1965).

some facts, say, might be related to the *"practices, personnel practices,"* of the agency, part of a file, part of a series of documents.

I am just talking off the top of my head about that problem, but I would say that you could get a situation where a factual statement or document came within that exception.

Mr. Kass. We are all talking, as you say, off the top of our heads. We are trying to create legislative history to determine what we intend.

Mr. Moss. *What this was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.*

Mr. Schlei. *Ah! Then the word "personnel" should be stricken.* Because "personnel" I think connoted certainly to use the employees relations, employee management rules and practices of an agency. What you meant was material related solely to the internal rules and practices of any agency for the guidance of its employees—something like that.

I do agree that there should be protection for the instructions given to FBI agents and bank examiners; people who, if they are going to operate in expectable ways, cannot do their jobs. Their instructions have to be withheld.

But I think that word "personnel" does not do the job well enough, Mr. Chairman. I am sure it can be done.

Mr. Moss. We will hope to seek a way of doing the job without exempting internal rules and practices.

Mr. Schlei. I suppose that could cover quite a lot of ground, Mr. Chairman.

Mr. Moss. Because I am afraid that we would there open the barn door to everything.

Mr. Schlei. Well, it is one of those things, Mr. Chairman, that just shows how hard it is to cover the whole Government with a few words. There are a number of problems.

Mr. Moss. Oh, we recognize the difficulty and the complexity, but we are perfectly willing to work at it.

It is clear from this exchange that Congressman Moss, author of H.R. 5012, had intended the words "internal personnel" to apply to both "rules" and "practices". He apparently wanted investigative manuals covered by the exemption, *but he was told flatly that the word "personnel" precluded such interpretation.* He acknowledged this, but stated his concern that excising "personnel" would "open the barn door" by leaving a broad exemption for all "internal rules and practices". The Senate was also told by several witnesses (at its hearings on the FOIA) that the proposed legislation did not protect investigative manuals and that if the Senate wanted to protect this material it would either have to expand Exemption 2,[44] Exemption 7,[45] or some other provision of the Act.[46] However, at no time did the Senate Committee or any individual Senator express a desire to cover investigative manuals and, accordingly, no change in the bill was made.

Finally, it is clear in reading Exemption 2 in the context of the Act as a whole that Congress intended to limit the word "practices" to "internal personnel" matters. The recognized purpose of the Act is to assure the broadest possible access to governmental records. Accordingly, the disclosure requirements are to be construed broadly, the exemptions narrowly. If the Justice Department's reading of Exemption 2 were accepted, the Act would not apply to "matters that are . . . related solely to the . . . practices of an agency." This would be an unlimited exemption, so broad that it would effectively swallow the rest of

**44.** Administrative Procedure Act: Hearings on S. 1160 et al., before the Subcomm. on Administrative Practices and Procedure of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. 34 (12, 14, 21 May 1965) (statement of Mr. Rains).

**45.** *Id.* at 112 (remarks of Mr. Benjamin).

**46.** *Id.* at 149 (statement of Professor Davis).

the Act. What *is not* an agency practice? What agency documents are there which *do not* relate to agency practices? And why would Congress have bothered to enumerate the other eight exemptions—"practices" would cover it all.

In short, a survey of every intrinsic and extrinsic aid relevant to interpretation of Exemption 2 supports our reading of the provision's specific language. The words "internal personnel" modify both the terms "rules" and "practices", and, if anything is clear, it is that the documents at issue here do not relate *"solely"* to *"internal"* or to *"personnel"* matters. Indeed, they may be said to relate *primarily* to *external substantive* matters.

### 2. *Legislative History*

With respect to the legislative history of this particular exemption, the Justice Department is in an even weaker position than with respect to its argument on the face of the statute, because the Supreme Court, in *Department of the Air Force et al. v. Rose, et al.* and this court in *Vaughn v. Rosen* (*Vaughn II*) have construed and discussed at length the legislative history of this exemption.

The perils of reliance on legislative history are nowhere better illustrated than with regard to Exemption 2, for rarely can there be found two such contradictory explanations of a statute's meaning than in the Senate and House Reports. The Senate Report on the Freedom of Information Act stated:

Exemption 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.[47] Diametrically opposite was the House Report:

2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions in routine administrative procedures which are withheld under the present law.[48]

Thus, the Senate Report interprets Exemption 2 as exempting only trivial "housekeeping" matters in which it can be presumed the public lacks any substantial interest. The language of the House Report, however, "carries the potential of exempting a wide swath of information under the category of 'operating rules, guidelines and manuals of procedures.'"[49] The Justice Department relies on the House Report and argues that the Manual and Guidelines are exempted from disclosure as "operating rules, guidelines, and manuals of procedure."

As a liminal matter, it must be remembered that committee reports are not the law; they are only aids in interpreting statutory language and are useful only to the extent they fairly reflect congressional intent.[50] Sometimes committee reports are not reliable guides to legislative intent, as, for example, where they contain statements that contradict the plain meaning of the statutory language[51] or that conflict with the expressed purpose of the statute.[52]

---

47. S.Rep. No. 813, 89th Cong., 2d Sess. 8 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418.

48. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), [1966] U.S.Code Cong. & Admin.News, p. 2427.

49. *Vaughn v. Rosen* (*Vaughn II*), 173 U.S.App. D.C. at 193, 523 F.2d at 1142.

50. *E. g., In re Evans*, 146 U.S.App.D.C. 310, 452 F.2d 1239, *cert. denied sub nom. United States v. Evans*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1971).

51. *Id.* at 316, 452 F.2d at 1245 ("[W]e would have difficulty accepting the report as, in effect, an amendment to the clear—and contrary—language of statute."); *Abell v. Spencer*, 96 U.S.App.D.C. 268, 225 F.2d 568, 570 (1955) ("One sentence in a Senate Report is not controlling where both houses of Congress have passed a bill containing unambiguous language to the contrary.").

52. *See United States v. General Motors*, 171 U.S.App.D.C. 27, 45, 518 F.2d 420, 438 (1975).

We first confronted the amazing discrepancy between the Senate and House Reports to the Freedom of Information Act in *Vaughn v. Rosen* (*Vaughn II*).[53] In that case we rejected the House Report as a reliable guide in construing Exemption 2 and chose to rely instead upon the Senate Report as being a truer indication of legislative intent. Every court which has *considered the difference* between the reports has done the same.[54]

In *Vaughn II* we expressed several reasons for preferring the Senate Report. First, we noted that the Senate Report language was more consistent with the actual wording of the statute, whereas the House Report appeared in several areas to depart from and indeed contradict the statutory language of the Act. This is an important factor in determining the relative reliability of committee reports.[55] Second, we observed that the House Report potentially exempted "a wide swath of information" but gave no guidance as to which matters are covered by the exemption and which are not, whereas the Senate Report provided a standard which agencies and courts could apply with certainty, consistency and clarity. The extent to which a committee report actually clarifies statutory language is also a relevant factor in determining its reliability, for reports are to be used to resolve ambiguities, not to create new ones.[56] Third, we noted that the sweeping interpretation of Exemption 2 favored by the House Report was incompatible with Congress' expressed intent to cut back on the previous exemption for "internal management." Fourth, we observed that the language of the House Report seemed less consonant with the overall scheme and general purpose of the Act than did the Senate Report:[57]

Reinforcing this interpretation is "the clear legislative intent [of FOIA] to assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests." As a result, we have repeatedly stated that "[t]he policy of the Act requires that the disclosure requirement be construed broadly, the exemptions narrowly." Thus, faced with a conflict in the legislative history, the recognized principal purpose of the FOIA requires us to choose that interpretation most favoring disclosure.

Finally, we addressed in *Vaughn II* what one commentator has called the "abuse of legislative history" which was involved in adoption of the House Report.[58] This refers to the fact that the expansive gloss placed on Exemption 2 and other sections of the Act by the House Report was the product of last minute chicanery by interested members of the House *after* the Senate had passed the bill and just as the full Committee in the House was about to report out the bill. The details of this episode have been placed on the public record by Benny L. Kass, who was counsel to the Foreign Operations and Government Operations Committee from 1962 to 1965, and who was later assistant counsel to the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee. Testifying in 1973 at Senate hearings on proposed amendments to the Freedom of Information Act, Mr. Kass explained "why the

---

53. Note 49 *supra*.

54. *See* cases cited in *Vaughn II, supra*, at n.13.

55. *See Montgomery Charter Service, Inc. v. Washington Metropolitan Area Transit Co.,* 117 U.S.App.D.C. 34, 325 F.2d 230 (1963); *Peoples Natural Gas Co. v. FPC,* 75 U.S.App.D.C. 235, 127 F.2d 153, *cert. denied,* 316 U.S. 700, 62 S.Ct. 1298, 86 L.Ed. 1769 (1942); *Hoover v. Intercity Radio Co.,* 52 App.D.C. 339, 286 F. 1003 (1923).

56. *E. g., FTC v. Manager, Retail Credit Co.,* 169 U.S.App.D.C. 271, 515 F.2d 988, 995 (1975) ("The proper function of legislative history is to resolve ambiguity, not to create it.").

57. 173 U.S.App.D.C. at 193, 523 F.2d at 1142.

58. *See generally* K. Davis, Administrative Law Treatise, § 3A.31 (1970 Supp.) at 174–76.

House report is so different from the rest of the bill": [59]

The basic reason that the House bill is different was after the Senate passed the Freedom of Information Act and it was about to be reported out of the House Government Operations Committee, the Justice Department—Mr. Katzenbach, Mr. Wozencraft—*came up and talked to Congressman Moss and said, look, we cannot support the bill. There are a number of changes that have to be made.*

I kind of appeared as an emissary on behalf of the former chairman of this subcommittee to Congressman Moss and I said it is our reading from the Senate that the *Senate has already passed this bill twice, that there should be no amendments.* We wanted to move forward with it. We have played with it long enough.

So basically what was done under really almost an implied veto—I don't think they ever specifically said they would veto it but there was an implied threat—*we tried to compromise a number of the specific objections into the House report.* I don't think time permits going into these details. I have a very brief analysis which I was going to submit. I have to type it and I will submit it for the record, pointing out where the *House kind of gave in to what the Justice Department wanted.*

Mr. Kass then pointed out eight sections in the House Report in which the Justice Department was able to get the language it wanted. Not surprisingly, the seventh area was the Report's description of Exemption 2. Mr. Kass concluded: [60]

I don't think it was a sellout but in any event it was really the price of getting the bill. It was my legal advice to both the chairman of this committee and the chairman, Congressman Moss, that *the legislative history only interprets and does not vitiate in any way the legislation and that the legislation was strong and was there.*

I think this is important just for the record to point out why the House report is different. Fortunately, as Mr. Dobrovir said, there have been a number of cases all of which have said that the House report is so different that we have to look to the statute and that *the House report should not in any way undermine the basic statute that was passed by Congress in 1966.*

This background is relevant to the weight that the House Report should be accorded as an item of legislative history. Statements in the report of a single House are not reliable guides to congressional intent where, as here, they have been inserted in an effort to *change* the meaning of the statutory language already adopted by the House which initiated the legislation. As Professor Davis said: [61]

The basic principle is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one. In this instance, only the bill, not the House committee's statements at variance with the bill, reflects the intent of both Houses. *Indeed, no one will ever know whether the Senate Committee or the Senate would have concurred in the restrictions written into the House committee report.*

\*    \*    \*    \*    \*    \*

The reasons why the courts will reject the House committee's abuse of legislative history, even though the Attorney General supports it, are overwhelming. Allowing the meaning of clear statutory words to be drastically changed by the

---

**59.** Freedom of Information, Executive Privilege, Secrecy in Government: Hearings on S. 1142 et al. before the Subcomm. on Administrative Practice and Procedure and the Subcomm. on Separation of Powers of the Senate Comm. on Judiciary and the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations (Volume 2), 93rd Congress, 1st Sess. 122–6 (7, 8, 11, 26 June 1973) (testimony of Benny L. Kass) (emphasis added).

**60.** *Id.* at 126 (emphasis added).

**61.** K. Davis, Administrative Law Treatise, § 3A.31 (1970 Supp.) at 175–76.

House committee report would have many unsound consequences. Three major ones are: (1) The House that acts first would be deprived of any voice in the final meaning of the enactment, for the House that acts second could always adopt the same bill but alter its meaning through committee reports. (2) The sound system of the conference committee would be defeated, for the House that acts second, even when it knows the other House disagrees, could always make law as it chooses through the committee reports. (3) Statutes which are clear on their face would become unreliable indicia of the effective law.

The position of this Court in *Vaughn II* has recently been vindicated by the action of the House of Representatives itself in passing the "Government in the Sunshine Act of 1976." [62] Professor Davis has recently suggested the relevance of the Sunshine Act to interpretation of the Freedom of Information Act: [63]

> The Freedom of Information Act, Advisory Committee Act, Privacy Act, and Government in the Sunshine Act all deal with the subject matter of openness of records and of meetings. Each of the four statutes has its own function. Each provision of each statute may be interrelated to one or more provisions of the other statutes. Furthermore, the various statutes often use language that is identical with the language of another statute. The meaning of that language may depend not only on legislative history and

interpretations with respect to the language of the one statute, but it may depend upon legislative history and interpretations with respect to the identical language that is used in one of the other statutes.

Of course, Professor Davis is correct, for it is a well established principle that courts may look to subsequent legislation as an aid in the interpretation of prior legislation dealing with the same or similar subject matter.[64] Indeed, Chief Justice Marshall stated the principle that, if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.[65]

Applying this principle, it is highly significant that the Government in the Sunshine Act, enacted in 1976, carries over verbatim most of the exemptions in the Freedom of Information Act, including the specific language of Exemption 2. Thus, 5 U.S.C. § 552b(c)(2) exempts from the Act's open meeting requirement portions of meetings likely to "relate solely to the internal personnel rules and practices of an agency." *The House Report to the Sunshine Act gives the same narrow interpretation to this exemption as the Senate did in 1965*: [66]

> (2) This exemption includes meetings relating solely to an agency's internal personnel rules and practices. It is intended to protect the privacy of staff members and to cover the handling of

---

62. Pub.L. No. 94–409, 90 Stat. 1241.

63. K. Davis, Administrative Law in the Seventies, § 3A.00–1 (Cumulative Supp.1977) at 23.

64. *E. g., W. A. Sheaffer Pen Co. v. Lucas*, 59 App.D.C. 323, 41 F.2d 117 (1930); *Apfel v. Mellon*, 59 App.D.C. 94, 33 F.2d 805, *cert. denied*, 280 U.S. 585, 50 S.Ct. 35, 74 L.Ed. 634 (1929); *Joy Floral Co. v. CIR*, 58 App.D.C. 277, 29 F.2d 865 (1929). *See District of Columbia v. Orleans*, 132 U.S.App.D.C. 139, 406 F.2d 957 (1968).

65. "It is to be observed that acts in pari materia are to be construed together as forming one act. If, in a subsequent clause of the same act, provisions are introduced, which show the

sense in which the Legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law." Chief Justice Marshall, in *Alexander v. Alexandria*, 5 Cranch 1, 3 L.Ed. 19.

66. H.R.Rep. No. 880 (Part I), 94th Cong., 2d Sess. 9 (1976), [1976] U.S.Code Cong. & Admin. News, pp. 2183, 2191 (emphasis added).

strictly internal matters. *It does not include discussions or information dealing with agency policies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures.* As is the case with all of the exemptions, a closing or withholding permitted by this paragraph should not be made if the public interest requires otherwise.

It thus appears that by 1976 the House of Representatives had repudiated the sweeping language concerning Exemption 2 contained in its 1966 report on the Freedom of Information Act.

This Court's rejection of the House Report has recently been vindicated by the Supreme Court. Five months after our decision in *Vaughn II*, the Supreme Court in *Department of the Air Force et al. v. Rose* [67] specifically considered the legislative history of Exemption 2, quoted at some length from our opinion in *Vaughn II*, and approved our reasoning therein, and likewise concluded, "[A]nd because we think the primary focus of the House Report was on exemption of disclosures that might enable the regulated to circumvent agency regulation, we, too, 'choose to rely upon the Senate Report' in this regard." [68]

In concluding its discussion of Exemption 2, the Supreme Court stated: "In sum, we think that, at least where the situation is not one where disclosure may risk circumvention of agency regulation, Exemption 2 is not applicable to matters subject to such a genuine and significant public interest. . . . Rather, the general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." [69]

From the words "at least where the situation is not one where disclosure may risk circumvention of agency regulation," the Justice Department argues that the Su-

preme Court implied that Exemption 2 should be stretched to cover such a situation. We cannot agree; this language of the Supreme Court means no more than that the Court cautiously left open the question of what to do about any exemption "where disclosure may risk circumvention of agency regulation." With the question left open, we have confronted the problem here, and as our analysis of the statutory language of Exemption 2 and its legislative history demonstrates, Exemption 2 was not designed to protect documents whose disclosure might risk circumvention of agency regulation, whatever would be the merits of such a provision. Exemption 2 is much more limited, as we have described. We thus hold that the documents sought by appellee are not exempt from disclosure under Exemption 2. We now turn to appellant's claim under Exemption 5.

## C. *Appellant's (b)(5) Claim*

At the outset we note the Justice Department's steadily diminishing reliance on Exemption 5 as a ground for withholding these documents. First, the U.S. Attorney's Office denied access by a letter which cited Exemption 5 *only* as a ground for denying public access. Then, in the District Court, the Government relied on both Exemptions 5 and 2. In this court, in its Original Brief filed before the panel, the appellant Department of Justice relied on § 552(a)(2), Exemption 2, and Exemption 5, in that order, plus a section citing Exemption 7 as "relevant to the intent of Congress." [70] In a 27-page brief the Government devoted only the last two pages to its argument under Exemption 5. In its 15-page Reply Brief the Government devoted only one paragraph, less than a page, to its Exemption 5 argument. In its Supplemental Memorandum, prior to the argument *en banc*, the Government relied upon § 552(a)(2), Exemption 7, and Exemption 2, in that order. Exemption 5 was not even mentioned.

**67.** Note 10 *supra.*

**68.** *Id.*, 425 U.S. at 366–67, 96 S.Ct. at 1602.

**69.** *Id.* at 369–70, 96 S.Ct. at 1603.

**70.** *See* note 110 *infra.*

■ We think this significant, because it appears that as the Government's analysis of its position was sharpened and refined, it became increasingly clear that Exemption 5 simply had no applicability to this case. We agree.

Exemption 5 of the Act,[71] shields from mandatory disclosure

. . . inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]

From the language of this exemption, it is clear that Congress has attempted to incorporate into the FOIA certain principles of civil discovery law. Specifically, Exemption 5 is designed "to exempt [from disclosure] those documents, and only those documents, normally privileged in the civil discovery context." [72] The test for determining whether particular documents fall within this exemption is set forth in the House Report, which states that "any internal memorandums which would *routinely* be disclosed to a private party through the discovery process in litigation with the agency would be available to the general public." [73] In other words, if a particular document falls within a recognized evidentiary privilege and, hence, would not normally be discoverable by a private party in the course of civil litigation with the agency, then the document likewise falls within the scope of Exemption 5 and is not releasable under the FOIA.

In its original brief on appeal the Department of Justice relied on three distinct evidentiary privileges in support of its Exemp-

tion 5 claim.[74] First, it suggested that the information contained in the Manual and FOT Guidelines is protected from disclosure by the "executive privilege" that attaches to *predecisional communications* which reflect the policymakers' deliberative processes. Second, it urged that the information is protected by the familiar attorney *work-product privilege* delineated in *Hickman v. Taylor.*[75] And, third, it asserted that these materials are "not discoverable by a party in litigation" because they set forth guidelines for the exercise of *prosecutorial discretion.* We conclude that each of these contentions is without merit.

1. *The Deliberative Process Privilege Claim*

One of the traditional evidentiary privileges available to the Government in the civil discovery context is the common-sense, common-law deliberative process privilege.[76] This privilege protects the "consultative functions" of government by maintaining the confidentiality of "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." [77] The privilege attaches to inter- and intra-agency communications that are part of the deliberative process preceding the adoption and promulgation of an agency policy. There are essentially three policy bases for this privilege. First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.[78] Second, it protects the

---

**71.** 5 U.S.C. § 552(b)(5).

**72.** *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 149, 95 S.Ct. at 1515.

**73.** H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), [1966] U.S.Code Cong. & Admin.News, p. 2418 (emphasis added).

**74.** Brief for Appellant at 26.

**75.** 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

**76.** *See* Louisell, Federal Evidence § 228–231 (1978). *See generally Nixon v. Sirica*, 159 U.S. App.D.C. 58, 121–23, 487 F.2d 700, 763–65 (1973) (Wilkey, J., dissenting).

**77.** *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.1966), *aff'd per curiam*, 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Grumman Aircraft Eng. Corp. v. Renegotiation Board*, 157 U.S.App. D.C. 121, 482 F.2d 710 (1973), *rev'd on other grounds*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

**78.** *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 151, 95 S.Ct. 1504; *Montrose Chemical Corp. v. Train*, 160 U.S.App.D.C. 270, 273, 491 F.2d 63, 66 (1974).

public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon.[79] And third, it protects the integrity of the decision-making process itself by confirming that "officials should be judged by what they decided[,] not for matters they considered before making up their minds." [80]

As the legislative history makes clear, Congress' *principal purpose* in adopting Exemption 5 was to protect the confidentiality of the pre-decisional deliberative process. The Senate Report states:

Exemption No. 5 relates to "inter-agency or intra-agency memorandums or letters which would not be available by law to a private party in litigation with the agency." It was pointed out in the comments of many of the agencies that it would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny. It was argued, and with merit, that efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to "operate in a fishbowl." The committee is convinced of the merits of this general proposition, but it has attempted to delimit the exception as narrowly as consistent with efficient Government operation.[81]

The House Report described the exemption in similar terms:

5. Inter-agency or intra-agency memorandums or letters which would not be available by law to a private party in litigation with the agency: Agency witnesses argued that a full and frank exchange of opinions would be impossible if all internal communications were made public. They contended, and with merit, that advice from staff assistants and the exchange of ideas among agency personnel would not be completely frank if they were forced to "operate in a fishbowl." Moreover, a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated before it completes the process of awarding a contract or issuing an order, decision or regulation. This clause is intended to exempt from disclosure this and other information and records wherever necessary without, at the same time, permitting indiscriminate administrative secrecy. S. 1160 exempts from disclosure material "which would not be available by law to a private party in litigation with the agency." Thus, any internal memorandums which would routinely be disclosed to a private party through the discovery process in litigation with the agency would be available to the general public.[82]

Guided by these expressions of legislative intent, the cases uniformly hold that Exemption 5 was designed to embody the traditional evidentiary privilege that attaches to predecisional, deliberative communications within an agency.[83] Thus, if a particular Government document falls within the scope of this evidentiary privilege, then it is

79. *See Grumman Aircraft Eng. Corp. v. Renegotiation Board*, note 77 *supra*, 157 U.S.App. D.C. at 129, 482 F.2d at 718; *Sterling Drug, Inc. v. FTC*, 146 U.S.App.D.C. 237, 245–246, 450 F.2d 698, 706–708 (1971).

80. *Grumman Aircraft Eng. Corp. v. Renegotiation Board*, note 77 *supra*, 157 U.S.App.D.C. at 129, 482 F.2d at 718. *See Boeing Airplane Co. v. Coggeshall*, 108 U.S.App. 106, 112, 280 F.2d 654, 660 (1960); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, note 77 *supra*, 40 F.R.D. at 325–326.

81. S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

82. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), [1966] U.S.Code Cong. & Admin.News, pp. 2418, 2427.

83. *E. g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 150, 95 S.Ct. 1504; *EPA v. Mink*, 410 U.S. at 86, 93 S.Ct. 827; *Merrill v. Federal Open Market Committee, supra* note 33, 184 U.S.App.D.C. at 208, 565 F.2d at 783; *Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 197, 523 F.2d 1136, 1146 (1975) ("We consider Exemption 5 as basically a codification of the common sense-common law privilege, *i. e.*, the recognition that the Government cannot operate in a fishbowl.").

likewise exempt from mandatory disclosure under the FOIA.

■ In order for a written document to be covered by this traditional evidentiary privilege, and hence shielded from disclosure by Exemption 5 of the Act, at least two prerequisites must be met. First, the document must be *pre*-decisional." The privilege protects only communications between subordinates and superiors that are actually *antecedent to the adoption of an agency policy.* Communications that occur *after* a policy has already been settled upon—for example, a communication promulgating or implementing an established policy—*are not* privileged. The various rationales for the privilege evanesce once a final policy decision has been reached. *Cessat ratione: cessat lex.* As the Supreme Court held in *NLRB v. Sears*:

> Exemption 5, properly construed, calls for "disclosure of all 'opinions and interpretations' which embody the agency's *effective law and policy*, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." [84]

However, it is not enough that a communication precede the adoption of an agency policy. The second prerequisite to privileged status is that the communication must be "deliberative", that is, it must actually be related to the process by which policies are formulated. As we emphasized in *Vaughn v. Rosen*, timing alone does not determine whether a specified document is protected by the privilege:

> [I]t is not enough to assert, in the context of Exemption 5, that a document is used by a decision-maker in the determination of policy. . . . Rather, to come within the privilege, and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Put

another way, pre-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take—of the deliberative process—by which the decision itself is made. [85]

Applying these principles to the documents sought by appellee Jordan in this case, it is clear that neither the withheld portions of the Manual nor the FOT Guidelines falls within the protection for the pre-decisional deliberative process embodied in Exemption 5. Both documents are instructions or guidelines issued by the U.S. Attorney and directed at his subordinates. They consist of positive rules that create definite standards for Assistant U.S. Attorneys to follow. The substantive content of these guidelines has already been determined by the U.S. Attorney. While they may not be absolutely binding on each Assistant, the guidelines do express the settled and established policy of the U.S. Attorney's Office. The Manual and FOT Guidelines thus represent the promulgation and implementation of policies that have *already been adopted.* Since the Manual and FOT Guidelines undeniably govern all of the office's work, they constitute its "effective policy" and thus are neither "predecisional" nor "deliberative."

### 2. *The Attorney Work Product Claim*

■ In the landmark case of *Hickman v. Taylor*,[86] the Supreme Court announced that the "work product" of attorneys enjoys a qualified privilege from discovery. This doctrine was subsequently refined and codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides in pertinent part that [87]

> a party may obtain discovery of documents and tangible things . . . *prepared in anticipation of litigation or for trial* by or for another party or by or for that other party's representative . .

---

**84.** 421 U.S. at 153, 95 S.Ct. at 1517.

**85.** 173 U.S.App.D.C. at 194–95, 523 F.2d at 1143–44.

**86.** 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed.2d 451 (1947).

**87.** Fed.R.Civ.P. 26(b)(3) (emphasis added).

only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party *concerning the litigation.*

This work-product rule is not limited to private parties; the case law establishes that the privilege applies to the work products of Government attorneys as well.[88]

The Senate Report to the FOIA states that Exemption 5 "would include the *working papers of the agency attorney* and documents which would come within the attorney-client privilege if applied to private parties." [89] Pointing to this legislative history, the Supreme Court held in *N. L. R. B. v. Sears, Roebuck* that Congress specifically intended to incorporate within Exemption 5 the attorneys' work-product privilege.[90] Thus, if a particular Government document falls within the scope of the work-product privilege, then it is likewise exempt from disclosure, in the FOIA context, by virtue of Exemption 5. In this case, the Department of Justice suggests that the Manual and Guidelines sought by appellee Jordan are the privileged work-product of the U.S. Attorney's Office and, hence, are covered by Exemption 5. This argument does not withstand analysis.

The work-product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does. Its purpose is more narrow, its reach more modest.

The Supreme Court articulated the rule's rationale in the *Hickman* case: [91]

Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

It is clear from this statement that the purpose of the privilege is to encourage effective legal representation *within the framework of the adversary system* by removing counsel's fears that his thoughts and information will be invaded by his adversary.[92] In other words, the privilege focuses on the integrity of the adversary trial process itself and seeks to ensure that such proceedings do not degenerate into mere "battles of wits." [93] This focus on the integrity of the trial process is reflected in the specific limitation of the privilege to materials "prepared in anticipation of litigation or for trial." [94]

In view of the work-product rule's underlying rationale, we think it clear that the Manual and FOT Guidelines sought by appellee do not fall within this privilege. Neither the Manual nor the Guidelines were prepared in anticipation of a particular trial; in fact, they were not even prepared in anticipation of trials in general. Rather, these documents were promulgated as general standards to guide the Government lawyers in determining whether or not to bring an individual to trial in the first place. The guidelines and instructions set forth in these documents do not relate to

88. *E. g., Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958).

89. S.Rep. No. 813, 89th Cong., 1st Sess. 2 (1965), [1966] U.S.Code Cong. & Admin.News, p. 2418.

90. 421 U.S. at 154, 95 S.Ct. 1504.

91. 329 U.S. at 511, 67 S.Ct. at 393.

92. *See Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 557 (2d Cir. 1967).

93. *Hickman v. Taylor*, 329 U.S. at 516, 67 S.Ct. 385 (Jackson, J., concurring).

94. Fed.R.Civ.P. 26(b)(3).

the conduct of either on-going or prospective trials; they do not include factual information, mental impressions, conclusions, opinions, legal theories or legal strategies relevant to any on-going or prospective trial. The public disclosure of these guidelines could have no conceivable effect on the actual conduct of an on-going or prospective trial. For these reasons, we conclude that the Manual and FOT Guidelines would not be privileged as "work products" in the civil discovery and, therefore, the Justice Department's Exemption 5 claim must fail to the extent that it is predicated on this privilege.

### 3. *The Prosecutorial Discretion Privilege*

In its initial brief on this appeal, the Department of Justice referred in only one paragraph to the "executive privilege" and lawyers' "work-product" privilege as grounds for withholding portions of the Manual and the FOT Guidelines under Exemption 5.[95] Seemingly, by devoting two paragraphs of its short section on Exemption 5 to this, it placed main emphasis on the claim that these documents were privileged because they were related to the exercise of prosecutorial discretion. The Department's brief states:[96]

> In a criminal prosecution or in a civil action the subject of which is a criminal prosecution, the reasons behind an exercise of prosecutorial discretion are not discoverable. Certainly, a defendant in a criminal case is not permitted to discover the thought processes and policies which went into the decision to bring the prosecution. . . . The exercise of prosecutorial discretion is privileged. Accordingly, memoranda setting forth guidelines for the exercise of that privilege are not discoverable by a party in litigation.

In spite of its specific, although fleeting, mention of the "predecisional" and "work-product" factors in its Original Brief, *supra*, in its Reply Brief the Justice Department disclaimed reliance on the executive and work-product privileges and rested its Exemption 5 claim *solely* on an asserted prosecutorial discretion privilege. The Reply Brief states in pertinent part:

> We have not contended that the materials at issue in this law suit are "pre-decisional" . . . or "work-product." Instead our point was that the concern of Exemption Five was to protect the secrecy of materials which would normally be protected by an evidentiary privilege. "Pre-decisional" memoranda are protected under the executive privilege, and a lawyer's work product is equally privileged. Similarly, the exercise of prosecutorial discretion is normally privileged; a criminal defendant cannot either through discovery in the criminal case or by civil litigation, go behind the decision to prosecute to discover how the decision was reached. Discovery of guidelines for the exercise of prosecutorial discretion through the FOIA would circumvent the privilege.[97]

This is the full extent of the Department's argumentation regarding the existence of a so-called "prosecutorial discretion privilege," and we must say that we are somewhat unclear as to exact contours of the privilege asserted.

The Department of Justice acknowledges that appellee Jordan *does not* seek access to documents reflecting the reasons for prosecution or non-prosecution in particular cases or explaining such decisions. Appellee seeks only policy guidelines and manuals of *general* applicability, established prior to and independently of a prosecutorial decision in any particular case. The Department's position thus seems to boil down to this: in the prosecution of any *particular criminal case*, the defense usually cannot discover the various factors and reasonings behind *that particular* decision to prosecute; therefore, Government guidelines delineating the standards to be applied in *all criminal cases* to determine which cases shall be diverted from prosecution are not discover-

---

**95.** Brief for Appellant at 26.

**96.** *Id.* at 26–27 (case citations omitted).

**97.** Reply Brief for Appellant at 14.

able in a civil suit. This posits a broad privilege indeed. It seemingly would cover any and all information bearing on the exercise of prosecutorial discretion, not only in particular cases but in all cases generally.

■ The Executive Branch of the Government has, or has claimed, quite a number of unique privileges; some are rooted in the common law, others are purportedly based on constitutional doctrines. The following governmental privileges are well-recognized:[98] (1) a state secret privilege concerning matters of military, diplomatic, or intelligence significance;[99] (2) an "executive privilege" covering inter- and intra-agency communications connected with policy-making and decision-making functions;[100] (3) a privilege covering reports on ongoing investigations;[101] (4) an informant's identity privilege covering identities of persons who come forward with information useful in civil or criminal cases;[102] and (5) a Presidential-executive privilege, rooted in the separation of powers doctrine, and covering communications among the President and his advisors.[103] In addition, the United States has available to it the familiar common law privileges applicable to private citizens, for example, the attorney work-product privilege. In our research, however, we have found no established evidentiary privilege pertaining generally to information bearing on the exercise of prosecutorial discretion.

The Department of Justice appears to rest its claim of privilege on essentially two lines of cases. The first line of cases stand for the proposition that a prosecutor's exercise of discretion is not reviewable by the courts. Representative of these cases is our decision in *Newman v. United States*, where we discussed at length the nature of prosecutorial discretion:

To say that the United States Attorney must literally treat every offense and every offender alike is to delegate him an impossible task; of course this concept would negate discretion. Myriad factors can enter into the prosecutor's decision. Two persons may have committed what is precisely the same legal offense but the prosecutor is not compelled by law, duty or tradition to treat them the same as to charges. On the contrary, he is expected to exercise discretion and common sense to the end that if, for example, one is a young first offender and the other older, with a criminal record, or one played a lesser and the other a dominant role, one the instigator and the other a follower, the prosecutor can and should take such factors into account; no court has any jurisdiction to inquire into or review his decision.

It is assumed that the United States Attorney will perform his duties and exercise his powers consistent with his oaths; and while this discretion is subject to abuse or misuse just as is judicial discretion, deviations from his duty as an agent of the Executive are to be dealt with by his superiors.

The remedy lies ultimately within the establishment where power and discretion reside. The President has abundant supervisory and disciplinary powers—including summary dismissal—to deal with misconduct of his subordinates; it is not the function of the judiciary to review the exercise of executive discretion whether it be that of the President himself or those to whom he has delegated certain of his powers.[104]

The second line of cases relied on by the Justice Department involve situations in which criminal defendants have challenged

98. *See generally* 2 Louisell, Federal Evidence §§ 224–238.

99. *See Halkin v. Helms,* Nos. 77–1922 & 77–1923 (D.C.Cir. 16 June 1978).

100. *See Kaiser Aluminum & Chemical Corp. v. United States, supra* note 88.

101. *See* 2 Louisell, Federal Evidence § 230.

102. *See United States v. Roviaro,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

103. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

104. 127 U.S.App.D.C. 263, 382 F.2d 479, 481–82 (1967).

their prosecutions as unconstitutionally discriminatory. These cases hold that defendants must make a preliminary colorable showing of selective prosecution before they become entitled to discover prosecutorial materials necessary to prove such a claim.[105] In *United States v. Berrios*,[106] for example, cited by appellant, the Government appealed from a district court order granting defendant's motion to dismiss because of the Government's failure to comply with an order requiring it to disclose to defendant a Government memorandum sought in support of defendant's claim of selective and discriminatory prosecution. Defendant's claim had been based solely upon his counsel's affidavit to the effect that he believed that facts indicating a vindictive motive on the part of the Government existed. The Second Circuit stated that "upon the meagre preliminary showing made [it doubted that it] would have granted a hearing or ordered the production of [the prosecutor's papers]." [107] Nevertheless, it held that the decision to permit a hearing and to authorize a subpoena for information within the Government's possession was a matter within the trial court's discretion and that the trial court had not abused its discretion in ordering the Government to turn over to him its memorandum recommending prosecution. The Court held further, however, that the district court went too far in directing the Government to surrender the memorandum for release to defendant of "any portions thereof which the court shall determine are not required to be kept confidential." The Court explained:

> Although Berrios does not object to redaction of any portions of the prosecutor's memorandum found by the court to be entitled to protection from disclosure on the grounds of confidentiality (e. g., the substance of grand jury testimony, see Rule 6(e), F.R.Crim.P.) he would at most be entitled under Rule 17(c), F.R. Crim.P. to introduce at a hearing only

material that is demonstrably relevant, i. e., which would tend to establish the elements of his defense of selective and discriminatory prosecution. Even under the district court's liberal ruling the test for disclosure should be the relevancy of the evidence to the specific defense for which it is sought, not its lack of confidentiality. The government is entitled to have withheld from the defendants all material in the memorandum which does not relate to the defense of selective prosecution. On the other hand, the government is not entitled, on a mere claim of generalized confidentiality, to withhold material that is relevant to the defense.[108]

We fail to see how the authorities cited by the Department to Justice support its assertion of a general privilege relating to prosecutorial discretion. The cases regarding the non-reviewability of prosecutorial discretion are simply inapplicable. Our decision today does not challenge these cases. The issue of reviewability is separate and distinct from the issue whether guidelines governing the exercise of prosecutorial discretion should be made available to the public. There are no doubt some who hope that the disclosure of prosecutorial guidelines will lead to judicial review of prosecutorial action based on those guidelines; but, that issue is not before us in this case.

We also find that the selective prosecution cases relied upon by the Department of Justice are distinguishable. These are criminal cases in which defendants are seeking access to the *particular* reasons for prosecution in *individual* cases. Even if there is a privilege relating to this type of particularistic information, the case law offers no support for the position that this privilege would extend to guidelines of general applicability established prior to and independently of the decision in any particular case. Moreover, because these cases are criminal, they are governed by criminal discovery

---

**105.** *E. g., United States v. Swanson*, 509 F.2d 1205 (8th Cir. 1975); *United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974); *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973).

**106.** Note 105 *supra.*

**107.** 501 F.2d at 1211.

**108.** *Id.* at 1212–1213.

rules, including Rule 16(b) of the Federal Rules of Criminal Procedure which expressly exempts from discovery reports, memoranda, or other internal government documents made by government agents *in connection with the* investigation and *prosecution of the case*. . . . [109] It is *this* rule, rather than any general privilege applicable in the civil discovery context, that has posed the obstacle to criminal defendants seeking to probe the basis of their individual prosecution.

We have thus examined the range of recognized evidentiary privileges and the authorities relied upon by the Department of Justice, and we have concluded simply that no recognized privilege exists such as would protect the withheld portions of the Manual and the FOT Guidelines from disclosure in the civil discovery context. Hence, the district court was correct in holding that Exemption 5 was inapplicable to these documents.

### D. *Appellant's (b)(7) Claim*

■ Initially the Justice Department relied on one exemption—Exemption 5—in denying appellee Jordan's request for documents. In the District Court, the Department expanded its defense, relying on two exemptions—Exemptions 2 and 5. In its initial appellate briefs in this court, the Department continued its reliance on only these two exemptions, plus a reference to § 552(a)(2).[110] Astonishingly, however, in a supplemental memorandum filed one month prior to oral argument before this *en banc* court, the Department invoked *for the first time* Exemption 7 *ex proprio vigore*. That provision applies to

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings . . . .

In our view, this Exemption 7 claim was not timely made by the Department, and consequently there is no need to consider its merits.[111]

■ It is basic that the FOIA establishes a statutory presumption that all federal records are available to "any person." This presumption is rebutted only by evidence presented by an agency that the item sought is exempt from disclosure under one of the nine enumerated exemptions. The agency bears the full burden of proof when an exemption is claimed to apply.[112] To meet this burden the agency must identify the *specific statutory exemption* relied upon and demonstrate that the exemption applies to the documents in question. This showing must be made *at the district court level*. An agency cannot prevail on an exemption that it has not raised either at the agency level or in the district court and that it has invoked for the first time in the appellate court.[113]

This principle derives not only from the basic requirements of the FOIA itself, but also from the fundamental precept that issues on appeal are to be confined to those duly presented to the trial court.[114] This principle reflects, in part, due process considerations, for if the Government does not raise a particular exemption as a defense in

**109.** Fed.R.Crim.Pro. 16(b) (emphasis added).

**110.** Exemption 7 was also brought in, but only as a manifestation of congressional intent: "We have never claimed that the materials at issue in this case fall under Exemption Seven." Reply Brief of Appellant at 5.

**111.** Furthermore, on this Exemption 7 issue, and throughout his dissent, Judge MacKinnon cites and relies on his own opinion for the panel in *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 192 U.S.App.D.C. , 591 F.2d 717 (1978). By order of this entire court, all panel opinions in *Ginsburg* were vacated.

**112.** *See* 5 U.S.C. § 552(a)(4)(B).

**113.** *Cf. Vaughn v. Rosen*, 173 U.S.App.D.C. at 194, 523 F.2d at 1143 (Court of Appeals would not consider rationale for applying exemption not raised in District Court).

**114.** *Doe v. McMillan*, 148 U.S.App.D.C. 280, 459 F.2d 1304 n. 10 (1972), *rev'd on other grounds*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). *See also Miller v. Avirom*, 127 U.S.App.D.C. 367, 384 F.2d 319 (1968); *Calhoun v. Freeman*, 114 U.S.App.D.C. 385, 316 F.2d 386 (1963).

the district court, the requesting party will have no opportunity to challenge and test the agency's evidence with respect to the applicability of the exemption.

From a practical standpoint, there are at least three situations in which an agency might be led to invoke an exemption on appeal for the first time. First, an agency might invoke an exemption for the first time on appeal in order to gain a tactical advantage over the requestor. Clearly, it is not consistent with the broad remedial purpose of the FOIA to permit such agency maneuvering. Second, an agency might be forced to invoke an exemption for the first time on appeal because of a substantial change in the factual context of the case or because of an interim development in applicable legal doctrine. Third, the agency might have an "afterthought" following district court proceedings. Normally, if an agency gives thorough and proper consideration to the disclosability of documents when it should, that is, when it receives the request in the first instance, then it should be able to cite all possibly relevant exemptions well before the appellate stage. However, we recognize that there could be circumstances where, through pure mistake, the Government attorneys had not invoked the correct exemption in the district court. If the value of the material which otherwise would be subject to disclosure were obviously high, e. g., confidential information compromising the nation's foreign relations or national security, and it appeared highly likely was intended to be protected by one of the nine enumerated exemptions, then under 28 U.S.C. § 2106, the appellate court would have discretion to "remand the cause and . . . require such further proceedings to be had as may be just under the circumstances." Such discretion might likewise be exercised in the second example above-cited.

By foreseeing that there *may* be situations where the appellate court's discretion should be exercised to order a remand for further consideration by the trial court, we do not by any means imply that either the district or appellate court has a free-ranging discretion in FOIA cases. It is a salutary rule, applicable in most cases and in the case at bar, that an appellate court will brush aside a claim put forward for the first time on appeal without reasonable cause or explanation. We find that this case presents no reason that warrants invocation of the residual discretion available under 28 U.S.C. § 2106.

## III. CONCLUSION

The Department of Justice's position ultimately reduces to a "public policy" argument for maintaining the confidentiality of the Manual and Guidelines sought by appellee Jordan. The assertion is that disclosure of these materials would "tip off" potential violators on how to break the law and avoid prosecution. Thus, according to the Department, releasing these documents will only benefit those who seek to circumvent the law; the law-abiding citizen gains nothing. Moreover, if public announcement of prosecution policy is made, the Department contends, the U.S. Attorney will be placed in the position of giving carte blanche and public encouragement to certain criminal activity. Faced with this situation, the only alternative is to do away with the guidelines and either prosecute *every* criminal violation, or more likely, allow a policy of non-prosecution of certain offenses to exist on a *sub rosa*, less controlled, and less uniform, word-of-mouth basis. These arguments have much merit, but they are simply not pertinent to the legal issues posed under the FOIA.

In effect, the Justice Department urges this court to balance the public interest in protecting these particular documents against disclosure against any legitimate interest these plaintiffs or other members of the public may have in utilizing these documents. This is an exhortation to balance disclosure of the individual documents involved in this particular case against the public interest in confidentiality. This the Court cannot do. The Freedom of Information Act certainly does not permit a court to balance the public good or harm involved in a disclosure or confidential retention of any

individual document. The balancing of the public interest in disclosure or nondisclosure has been done by Congress by categories.

On reflection, it becomes clear that for a court to balance the public interest in disclosure or nondisclosure, with reference to the particular documents involved in a case, would destroy completely the effectiveness of the Freedom of Information Act. This procedure was what occurred before the passage of the Act in 1966. The whole scheme of the Act, as analyzed above, is to decree: first, in Section 552(a) the particular methods by which all records are to be made available to the public, whether (1) published in the Federal Register, or (2) made available for inspection and copying, or (3) to be made available upon request; and second, following the mandate of disclosure, in Section 552(a) are listed the nine specific enumerated exemptions.

The whole question of whether any Governmental document should be disclosed or protected against disclosure is a matter of public policy for legislative determination in the first instance. There is no constitutional question involved here on which a court might feel free to express itself. The whole question of what is to be disclosed is one on which the Congress has spoken in precise, enumerated detail.

If Congress has erred, Congress has erred, and it is not for this or any other court to rewrite a statute, in which we might consider to have been omitted necessary items in a list of exemptions against disclosure. "[T]he making of such exemptions is the function of the legislature, not the court." [115] On the face of the statute, on its legislative history, the Manual and Guidelines sought by appellee do not fall within the specific language of Exemption 2 or Exemption 5. This court cannot write

in an exemption to protect these documents without rewriting the statute. This we decline to do.

*Affirmed as Modified.*

BAZELON, Circuit Judge, concurring:

I concur in the court's opinion, and write separately only to stress what I view as an important feature of this decision: hereafter the settled standards which guide the United States Attorney's discretion will be available to the Bench, Bar and the public at large. One of the principal purposes of the Freedom of Information Act is to eliminate "secret law." [1] The settled practices of the government, in deciding which cases to prosecute and which cases to divert from the courts are, if not codified "law," at least as important as any statute to the individual charged with a crime.

> [T]he standards which guide prosecutors in the exercise of their discretion are as much a part of the law as the rules applied in court. Indeed, the impact of such standards is more decisive for many defendants than that of any other legal rules.

*Scott v. United States,* 136 U.S.App.D.C. 377, 390, 419 F.2d 264, 277 (1969).

The public availability of these general policy manuals will serve fundamental interests in the criminal justice system by helping to assure that the exercise of prosecutorial discretion is even-handed, rational, and consonant with statutory intent, which are touchstones for the proper exercise of such discretion. *See, e. g., Hutcherson v. United States,* 120 U.S.App.D.C. 274, 284–287, 345 F.2d 964, 972–977 (1965) (Bazelon, C. J., concurring and dissenting), *cert. denied,* 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965).[2] Since prosecutors' discretion may be all but unreviewable in individual

---

**115.** *Merrill v. Federal Open Market Committee, supra* note 33, 184 U.S.App.D.C. at 210, 565 F.2d at 787. *Cf.* Chief Justice Burger in *T. V. A. v. Hill,* 437 U.S. 153, 195–198, 98 S.Ct. 2279, 2302–03, 57 L.Ed.2d 117 (1978).

**1.** *N. L. R. B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 153, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Schwartz v. IRS,* 167 U.S.App.D.C. 301, 303, 511 F.2d 1303, 1305 (1975).

**2.** Judge Leventhal has cogently identified one important reason for concluding that refusing to disclose these guidelines might lead to inequitable treatment of some defendants. *See* concurring op. at —— of 192 U.S.App.D.C., at 784 of 591 F.2d.

cases, it is all the more important that the public and the courts be informed of the general criteria which prosecutors apply in selecting which cases to prosecute and what charges to bring.[3]

I find it appropriate that the Freedom of Information Act, which was designed to shed sunlight on the processes of government, should direct its illuminating rays on this vitally important aspect of the criminal process.

LEVENTHAL, Circuit Judge, joined by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring:

I concur in affirmance. But I have reservations as to certain aspects of Judge Wilkey's opinion concerning Exemption 2.[1] Its wording and legislative history have been the subject of extensive commentary. It suffices for present purposes to refer to the Supreme Court's opinion in *Dept. of Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and at a lower level to the opinions in *Vaughn v. Rosen II.*[2]

Exemption 2 provides that the Act does not apply to matters that are—

(2) related solely to the internal personnel rules and practices of an agency.

All agree that the adoption of this wording in 1966 embodied a Congressional policy effectuating a narrower reach for the exemption than that previously provided for "any matter relating solely to the internal management of an agency." *Rose,* 425 U.S. at 362, 96 S.Ct. at 1600. The issue is the extent of the exemption as narrowed.

The Senate Report stated:

Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.[3]

The House Report stated:

2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure    .[4]

In my view, the critical words of Exemption 2 are "solely" and "internal." Exemption 2 applies only when the matters sought for disclosure are related *solely* to the *internal* personnel rules or to the *internal* practices of an agency.

The focus on what is *internal* is plain from the summarizing paragraph of *Rose.* The *Rose* litigation involved case summaries of honors and ethics hearings prepared by the cadet committee administering the honor code of the Air Force Academy, summaries that had been posted on squadroom bulletin boards and distributed to Academy faculty and officials. The Supreme Court said (425 U.S. at 369–79, 96 S.Ct. at 1603):

In sum, we think that, at least where the situation is not one where disclosure may risk circumvention of agency regulation, Exemption 2 is not applicable to matters subject to such a genuine and significant public interest. The exemption was not designed to authorize withholding of all matters except otherwise secret law bearing directly on the propriety of actions of members of the public. Rather, the general thrust of the exemp-

---

3. The ABA has fully supported this view, recommending not only that prosecutors develop a statement of policies to guide discretion, but that these be disclosed to the public. "The public interest will be best served by having general policies, procedures and guidelines known to the bar and, indeed, to the courts." ABA Standards Relating to the Prosecution Function (approved draft 1971) § 2.5 (commentary).

1. 5 U.S.C. § 552(b)(2).

2. 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975). The word "opinions" is used here to include both Judge Wilkey's opinion for the panel, and Judge Leventhal's concurring opinion. Both are cited with approval in *Rose,* Judge Wilkey's at 425 U.S. 365–66, 96 S.Ct. 1592, and Judge Leventhal's at 425 U.S. 370 n. 7, 96 S.Ct. 1592.

3. S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965) U.S.Code Cong. & Admin.News 1966, p. 2418.

4. H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1966) U.S.Code Cong. & Admin.News 1966, p. 2427.

tion is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest. The case summaries plainly do not fit that description. They are not matter with merely internal significance. They do not concern only routine matters. Their disclosure entails no particular administrative burden. We therefore agree with the Court of Appeals that, given the Senate interpretation, "the Agency's withholding of the case summaries (as edited to preserve anonymity) cannot be upheld by reliance on the second exemption."

What is the legal posture of the situation specifically reserved in the first sentence of the above passage, one "where disclosure may risk circumvention of agency regulation?" Judge Wilkey puts it (at ―― ―― of 192 U.S.App.D.C., at 771 of 591 F.2d) that this consideration simply plays no part in triggering Exemption 2. I disagree. In my view, Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation. That composite presents a matter that involves solely internal personnel rules and internal practices of an agency for purposes of making Exemption 2 applicable.

Judge Wilkey seems to be of the view that this construction is supported solely by the House Report, and that Report must be treated as a nullity. It is plain that the House Report is not as persuasive generally as the Senate Report, which is more congruent with the liberalizing disclosure purpose of the legislation.[5] But the House Report is not a nullity. Indeed, it was explicitly incorporated into Justice Brennan's opinion in *Rose* (425 U.S. at 366–67, 96 S.Ct. at 1602):

> For the reasons stated by Judge Wilkey, *and because we think the primary focus of the House Report was on exemption of disclosures that might enable the regulated to circumvent agency regulation,* we too "choose to rely upon the Senate Report" in this regard. (Emphasis added.)

Neither *Rose, Vaughn II,* nor *Jordan* involves an instance where the Senate Report—which only purports to offer examples of Exemption 2, and not an exhaustive catalog—is flatly inconsistent with the House Report. Judge Wilkey seems to assume that the House Report is to be disregarded if it speaks to a point that is not also addressed in the Senate Report. That is not the sense of the passage quoted from Justice Brennan's opinion.

The Supreme Court was hospitable to the House Report insofar as it provided an "exemption of disclosures that might enable the regulated to circumvent agency regulation." That feature may not be determinative but it is material. And when what is involved are internal instructions to such officials as bank examiners and investigators, and revelation would permit circumvention of law and regulations by the regulated and there is no substantial valid external interest, there is the essential quality of predominant internality[6] contemplated by Exemption 2.

Apart from matters of taste involved in Judge Wilkey's reproach of House members for "chicanery" in interjecting belated legislative history (at ―― of 192 U.S.App. D.C., at 768–769 of 591 F.2d), it should perhaps be brought out that in the spring of 1965, at the outset of the House hearings and months prior to the Senate Report, Congressman John E. Moss, chairman of the subcommittee, while attended by committee

---

**5.** "The House Report is more restrictive. Generally, then, the Senate Report may be taken as more in keeping with the overall purpose of disclosure. But that does not answer questions about the construction of any particular provision." *Vaughn v. Rosen,* 173 U.S.App.D.C.

187, 199, 523 F.2d 1136, 1148 (1975) (Leventhal, J., concurring).

**6.** *See Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 201–02, 523 F.2d 1136, 1150–51 (1975) (Leventhal, J., concurring) ("solely" is not to be given an extreme construction).

counsel Benny Kass, said this of Exemption 2:

> Mr. Moss. What this was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an F.B.I. agent.

While assistant attorney general Norbert Schlei remarked that different wording would have to be provided to accomplish this objective, he confessedly was "just talking off the top of my head." [7] And the Department of Justice had its own reasons for preferring broader wording for the exemption.

Having said all this, I join in the judgment of the court because I do not consider this to be a case of predominant internality, but rather a case of substantial public interest in disclosure that is not offset by an interest in preventing circumvention of law or regulations. The policies involved all relate to post-violation procedures. Defense counsel involved have a legitimate interest in knowing the general guidelines for prosecution vel non. Instructions to Assistant United States Attorneys are directives to a class typically in government service for a relatively modest period of time. When they resign, often to represent defendants, they take with them their knowledge of such guidelines. This is not improper, but other defendants represented by other defense counsel have an interest in equal treatment. The government can phrase its directives to provide escape clauses that permit the exercises of judgment to depart from general prosecution guidelines. The core requirement of Exemption 2 is predominant internality, and in my view

that does not fairly characterize the case at bar.

\*     \*     \*     \*     \*     \*

If Exemption 2 is not to be given this kind of interpretation, then I must acknowledge some sympathy for the opinions that implement the conviction that Congress's actions concerning § 552(a)(2)(C) (for availability of administrative manuals) contains an implication of non-disclosure for enforcement manuals "where the sole effect of disclosure would be to enable law violators to escape detection." *Hawkes v. Internal Revenue Service,* 467 F.2d 787, 795 (6th Cir. 1972). *See also, Cox v. Department of Justice,* 576 F.2d 1302, 1309 (8th Cir. 1978): "Thus, FOIA does not require disclosure of any portions of the manual [Drug Enforcement Agency Agents Manual] that relate to housekeeping matters or information that would impede law enforcement efforts."

\*     \*     \*     \*     \*     \*

Upon consideration of Judge MacKinnon's dissenting opinion, I am inclined to agree that Exemption 7 should be considered in support of the district court judgment, especially in view of the fact that the complaint and the district court relied solely on § 552(a)(2) and the majority proceeds on a different ground. However, I am of the view that this case does not trigger Exemption 7, which only applies to "investigatory records compiled for law enforcement purposes." What is before us are general instructions to, and manuals for, prosecutors that enter the picture only after an investigation has been completed. The request for documents, if granted, would not reveal any "investigatory records" protected by Exemption 7, or present any of the specific harms to the law enforcement process that Exemption 7, as amended, was intended to avoid.[8]

---

**7.** Federal Public Records Law Part I: Hearings on H.R. 5012, et al., before the Foreign Operations and Government Information Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess. 29–30 (March 30–April 5, 1965).

**8.** In substance, I am persuaded by the presentation on Exemption 7 made by plaintiff's counsel in the district court. In the course of arguing for rejection of the government's Exemp-

tion 5 claim, he relied on the manifest inapplicability of Exemption 7, stating (JA 54): "[N]one of the specific harms to law enforcement process, which is the object of that amendment to avoid, would occur. Thus, there is no claim here that disclosure would impede an investigation, would interfere with enforcement proceedings, would disclose confidential sources, would invade personal privacy, would

MacKINNON, Circuit Judge, dissenting:

In its construction of § 552(a)(2)(C) the majority opinion by Judge Wilkey holds that the prosecuting instructions issued by the United States Attorney to aid his assistants are *exempt* from disclosure because of the congressional intent expressed in the committee reports they constitute "instructions to Government personnel prosecuting cases in court" and " 'law enforcement matters' . . .—both the Manual and the Guidelines—[that] fall within this description of non-covered materials." Maj. Op., p. —— of 192 U.S.App.D.C., p. 760 of 591 F.2d. Yet, in the very next sentence the majority holds that the prosecution instructions are not exempt from disclosure. Maj. Op., p. —— of 192 U.S.App.D.C., p. 760 of 591 F.2d; *see id.* pp. ———— of 192 U.S.App.D.C., pp. 759–761 of 591 F.2d. In so ruling the majority violate the clear intent of Congress and the fundamental rule of statutory interpretation that a specific provision overrides a general provision addressed to the same concern. From such construction I respectfully dissent.

1. *Section 552(a)(2) and the Specific Intent of Congress.*

The construction indulged in by the majority opinion is reached by restricting (a)(2) to exempting prosecution instructions *only* from indexing *and* disclosure and then going on to hold that such exemption from disclosure is meaningless and that all such records are obtainable under (a)(3)[1] upon a mere "request for records . . . reasonabl[y describing them]." Since any record can be *reasonably described,* and usually is in the request for it, such construction of the statute is unreasonable and unrealistic. The admitted exemption in (a)(2) for prosecution instructions would thus be rendered

disclose investigative techniques, or would endanger life or limb of an officer in the U.S."

1. 5 U.S.C. § 552(a)(3) provides:
     Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place,

completely useless. The recognized intent of Congress in (a)(2) excluding prosecution instructions from compelled disclosure would be completely obliterated by merely including a description of the record in a request. Both subsections (a)(2) and (a)(3) are *disclosure* provisions, and it is incongruous to attribute to Congress an intent specifically to exempt prosecution instructions under one subsection and to require their disclosure under the very next succeeding subsection. The theory of construction indulged in by the majority opinion is too finely spun and too unreasonable to overcome the clearly expressed intent expressed by both Houses as to the result the Congress sought to bring about by (a)(2). The clear statements of legislative intent in the Committee Reports of *both* Houses indicate that Congress intended "prosecution . . . instructions" to be completely exempt from disclosure and this should not be made useless by construction.

Subsection (a)(1) of § 552 requires that certain material be published in the Federal Register; (a)(2) requires "*administrative staff manuals and instructions to staff that affect a member of the public*" (emphasis added) to be made available for public inspection and copying; and (a)(3) provides that, except with respect to records made available under (a)(1) and (a)(2), each agency "upon any request" which "reasonably describes such records," and complies with agency rules as to time, place, fees and procedures, shall make the records promptly available to any person.

In enacting these provisions the Senate Committee Report specifically stated that it intended by its reference to "*administrative staff manuals*" in § 552(a)(2)(C)[2] to exempt prosecution instructions:

fees (if any), and procedures to be followed, shall make the records promptly available to any person.

2. 5 U.S.C. § 552(a)(2)(C) provides in part:
     (a) Each agency shall make available to the public information as follows: . . . .
     (2) Each agency, in accordance with published rules, shall make available for public inspection and copying— . . .

The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters rather than to law enforcement matters protects the *traditional confidential nature of instructions to government personnel prosecuting violations of law in court*, while permitting a public examination of the basis for administrative action.

S.Rep.No.813, 89th Cong., 1st Sess. 2 (1965) U.S.Code Cong. & Admin.News 1966, p. 2418 (emphasis added). There is nothing in the congressional intent so expressed to indicate that the Senate intended it to be restricted to exempting the disclosure of such records solely from indexing *and* disclosure and not from those provisions of the act that require only disclosure. In this respect the majority misread the statute. *See* Maj. Op., pp.         of 192 U.S. App.D.C., pp. 760–761 of 591 F.2d. Indexing of orders, opinions, instructions, etc., is *not* a requirement for exempting such records from disclosure but is only required if the agency seeks to rely thereon, use, or cite them as precedent against a party other than an agency, per § 552(a)(2)(C).[3] Since no such reliance or use is sought for its prosecution instructions the claim of the majority that there is some difference between the effect of (a)(2) and (a)(3) upon such instructions is without any support in the statute or in the legislative history.

Prosecution instructions need not be indexed before they can be given their intended advisory use within the office of the United States Attorney. The entire point of the majority in this respect is thus shown to be meaningless, unreasonable and without any practical foundation. This completely refutes the remainder of the majority opinion by decisively undermining the construction of the act upon which it rests its decision. Maj. Op., p.        of 192 U.S. App.D.C., p. 763 of 591 F.2d. Since indexing is only compulsory when an agency seeks to rely, use or cite the record material "as precedent against a party,"[4] to interpret the statute as though Congress intended to only exempt the instant prosecutorial instructions from indexing and not eventually from all disclosure would rely on an unjustified construction because the statute does not require indexing before use by the staff to aid in the exercise of its prosecutorial discretion—the only intended use of such instructions.

It is also of utmost significance to the issue with which we are confronted to note that the Senate indicated by its Committee Report, *supra*, that the statute was specifically providing for such exclusion from disclosure of such instructions because of the "*traditional confidential nature of [prosecution] instructions.*" Thereby the Senate referred to the common law attorney-client privilege and Congress indicated that it in-

(C) *administrative staff manuals and instructions to staff that affect a member of the public*; unless the materials are promptly published and copies offered for sale.
*See* n. 3, *infra*. (Emphasis added).

3. 5 U.S.C. § 552(a)(2)(C) provides in part:
  (a) Each agency shall make available to the public information as follows: . . .
  (2) Each agency, in accordance with published rules, shall make available for public inspection and copying— . . .
  (C) . . . Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and *required by this paragraph to be made available or published.* Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supple-

ments thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public *may be relied on, used, or cited as precedent by an agency against a party other than an agency* only if—
  (i) it has been indexed and either made available or published as provided by this paragraph; or
  (ii) the party has actual and timely notice of the terms thereof.
(Emphasis added).

4. *Id.*

tended a government agency to be considered as a client under the Freedom of Information Act.

The Senate Report states that Exemption 5 "would include the working papers of the *agency attorney and documents which would come within the attorney-client privilege if applied to private parties*," S.Rep. No. 813, p. 2; and the case law clearly makes the attorney's work-product rule of *Hickman v. Taylor*, 329 U.S. 495 [67 S.Ct. 385, 91 L.Ed. 451] (1947), applicable to Government attorneys in litigation. *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp., at 947, 141 Ct.Cl., at 50; *United States v. Anderson*, 34 F.R.D. 518 (Colo. 1963); *Thill Securities Corp. v. New York Stock Exchange*, 57 F.R.D. 133 (E.D.Wis. 1972); *J. H. Rutter Rex Mfg. Co., Inc. v. NLRB*, 473 F.2d 223 (CA5), *cert. denied*, 414 U.S. 822 [94 S.Ct. 120, 38 L.Ed.2d 55] (1973).

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975) (emphasis added). In *Mead Data Cent. Inc. v. U.S. Dept. of Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (1977), we also recognized that the Department of the Air Force as an agency of Government was entitled to the same privilege as a private client for its "confidential communications to [its] attorney." In his dissent in *Mead Data*, Judge McGowan also recognized the privilege and would have applied it more broadly than the majority. 184 U.S.App. D.C. 371–372, 566 F.2d at 263–264.

The House Committee Report, in addition to that of the Senate, also included a statement indicating an intent to exempt from disclosure those "prosecution . . . staff manuals and instructions which set forth ["prosecution"] criteria or guidelines for the staff . . . ." And the House Report further indicated that it intended such interpretation to apply to *all of S. 1160* and not to be confined solely to (a)(2) as the majority opinion contends:

In addition to the orders and opinions required to be made public by the present law, subsection (b) of S. 1160 would require agencies to make available statements of policy, interpretations, staff manuals, and instructions that affect any member of the public. This material is the end product of Federal administration. It has the force and effect of law in most cases, yet under the present statute these Federal agency decisions have been kept secret from the members of the public affected by the decisions.

As the Federal Government has extended its activities to solve the Nation's expanding problems—and particularly in the 20 years since the Administrative Procedure Act was established—the bureaucracy has developed its own form of case law. This law is embodied in thousands of orders, opinions, statements, and instructions issued by hundreds of agencies. This is the material which would be made available under subsection (b) of S. 1160. *However, under S. 1160* an agency may not be required to make available for public inspection and copying any advisory interpretation on a specific set of facts which is requested by and addressed to a particular person, provided that such interpretation is not cited or relied upon by any officer or employee of the agency as a precedent in the disposition of other cases. *Furthermore, an agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines for the staff* in auditing or inspection procedures, or *in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases.*

H.R.Rep.No.1497, 89th Cong., 2d Sess. 7–8 (1966) U.S.Code Cong. & Admin.News 1966, p. 2424 (emphasis added). The statement italicized above is a continuation of the reference in the prior sentence to all provisions *"under S. 1160."* Thus, the language of the Report indicates a clear legislative intent to *exempt from disclosure* "under S. 1160"—*i. e.*, the entire act, not just (a)(2)—those "staff manuals and instructions which set forth criteria or guidelines for the staff in . . . the selection or handling of cases . . . or criteria for . . .

*prosecution . . . of* cases." This specific provision completely exempts the subject prosecution instructions.

And when the Senate Report refers to the *"traditional confidential nature* of [prosecution] instructions" and thereby indicates it is recognizing the common law privilege of such material, it indicates an additional intent that such material should be exempted from all disclosure requirements of the FOIA. It would be the height of absurdity to construe such recognition of the *traditional* confidential nature of prosecution instructions as being limited only to exemption from indexing, which is not required except for secret law. That would be no recognition at all of the traditional confidential nature of such instruction which is grounded in the traditional attorney-client relationship that exists between the Government and its prosecutors. *See,* p. —— of 192 U.S.App.D.C., at pp. 786·787 of 591 F.2d *supra.* Thus, according to the intent expressed by both Houses, the specific exemption from disclosure extends to *the entire Act* including (a)(2) and (a)(3), and the last sentence of subsection (b). *Cf.* Maj. Op. p., —— of —— U.S.App.D.C., at p. 763 of 591 F.2d.

## 2. *The Interpretation of Conflicting Specific and General Statutory Provisions.*

In addition to the above interpretation based upon the specific intent expressed by both Houses of Congress recognizing the traditional confidential nature of such material and excluding prosecution instructions from *all disclosure* "under S. 1160" [the Act], such interpretation is also required by that rule of statutory construction which requires the *specific exemption* in (a)(2) to control the subsequent *general* provision of (a)(3) with which it might conflict. As the Supreme Court stated in *Fourco Glass Co. v. Transmirra Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957):

**5.** Professor Davis does acknowledge that contrary arguments do have plausibility, and without conclusively resolving the matter, states generally that "when the technical analysis is pushed that far, the court's policy thinking about the specific issue before the court may sometimes properly play a key role." *Id.* This

"However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling.' *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208 [52 S.Ct. 322, 76 L.Ed. 704]" *MacEvoy Co. v. United States,* 322 U.S. 102, 107 [64 S.Ct. 890, 88 L.Ed. 1163.]

353 U.S. at 228–29, 77 S.Ct. at 791. This principle was recently reiterated in *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), where Justice Brennan remarked:

Finally, our result is supported by the principle that gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern, even if the general provision was enacted later. See *Preiser v. Rodriquez,* 411 U.S. 475, 489–490 [93 S.Ct. 1827, 36 L.Ed.2d 439] (1973). Cf. 2A C. Sands, Sutherland, Statutory Construction § 51.05 (4th ed. 1973).

435 U.S. at 15, 98 S.Ct. at 914.

With respect to this conflict in the FOIA Professor Davis stated:

[T]he (a)(2) intent is more specific than the broad and general intent of (a)(3), and the usual canon of interpretation is that the specific should prevail over the general when the two provisions are inconsistent.

K.C. Davis, *Administrative Law in the Seventies* 57 (1976).[5] The foregoing principle is firmly established. *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904) set it forth as follows:

It is a well-settled principle of construction that specific terms covering the given subject-matter will prevail over general language of the same or another stat-

last conclusion should not be considered to apply to the facts of this case, as it appears that under the specific statements of intent by Congress with respect to "prosecution instructions" that disclosure is not required by (a)(2), and in this case that expression of intent should end the analysis.

ute which might otherwise prove controlling.

195 U.S. at 125, 24 S.Ct. at 803. *United States v. Salen*, 235 U.S. 237, 249, 35 S.Ct. 51, 59 L.Ed. 210 (1914); *United States v. Stever*, 222 U.S. 167, 32 S.Ct. 51, 56 L.Ed. 145 (1911); *Kepner v. United States*, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *FTC v. Manager, Retail Credit Co., Miami Branch Office*, 169 U.S.App.D.C. 271, 276–77, 515 F.2d 988, 993–94 (1975); *Maiatico v. United States*, 112 U.S.App.D.C. 295, 300–01, 302 F.2d 880, 885–86 (1962); *American Telephone and Telegraph Co. v. FCC*, 487 F.2d 864, 877 n.26 (2d Cir. 1973); *Monte Vista Lodge v. Guardian Life Ins. Co. of America*, 384 F.2d 126, 129 (9th Cir. 1967), *cert. denied*, 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968); *Cuevas v. Sdrales*, 344 F.2d 1019, 1020–21 (10th Cir. 1965), *cert. denied*, 382 U.S. 1014, 86 S.Ct. 625, 15 L.Ed.2d 528 (1966); *United States ex rel. Chapman v. FPC*, 191 F.2d 796 (4th Cir. 1951), *aff'd* 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); *Buffum v. Chase Nat. Bank of City of New York*, 192 F.2d 58, 61 (7th Cir. 1951), *cert. denied*, 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 702 (1952). *Cf. United States v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. Alpers*, 338 U.S. 680, 682–83, 70 S.Ct. 352, 94 L.Ed. 457 (1950); *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936). It therefore clearly appears from the specific intent expressed in the Committee Reports and the applicable principles of statutory interpretation as recognized by the Supreme Court that Congress must be recognized by the foregoing specific expressions of intent to have purposely intended to exempt prosecution instructions from all *disclosure* and that it did not commit "legislative error" in doing so to arrive at "a somewhat peculiar regime." *Cf.* Wilkey, J., Opinion at p. —— of 192 U.S.App.D.C., at p. 762 of 591 F.2d. Actually the novel claim of "legislative error" is an imaginative creation of the writer that was induced by an approach which applied a wooden interpretation to the entire statute. Such approach finds it impossible to recognize that Congress by (a)(2)(C) *specifically*

exempted prosecution instructions—*which all admit*—and that such exemption is just as much "specifically stated in . . . section [§ 552]," *see* subsection (C), as any of the nine exemptions set forth in subsection (b). The intent of Congress with respect to both subsection (C) and the nine exemptions is to be determined from the language of the statute and from the Committee Reports. It appears that one of the basic defects in the majority opinion is its inability to recognize that both the House and Senate Reports also indicate the congressional intent of the statutory language.

3. *The Majority's Treatment of the Exemptions and its Interjection of Subsection (a)(3) of section 552.*

Since the legislative intent of both Houses with respect to (a)(2), as the majority opinion admits, plainly exempts "prosecuting . . . instructions," it is not necessary to find an additional exemption from disclosure in (b)(2) dealing with "internal personnel rules and practices of an agency", or in (b)(5) exempting certain "inter-agency or intra-agency memorandums", or in (b)(7) which exempts certain "investigatory records compiled for law enforcement purposes." However, it is perfectly clear that when the Senate Committee Report based its exemption of "prosecuting . . . instructions" upon their "*traditional confidential nature*" and indicated that the exemption, so based, extended not just to (a)(2) but to the entire act, that the (b)(5) exemption when it refers to "intra-agency memorandums . . . which would not be available by law to a party other than an agency in litigation with an agency" embodies the common law attorney-client privilege for prosecutorial instructions which the Senate Report encompassed. *See* p. —— of 192 U.S.App.D.C., p. 786 of 591 F.2d, *supra*.

The discussion of (b)(2) and (b)(5) in *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 192 U.S.App.D.C. ——, 591 F.2d 717 (1978), is also applicable here to a considerable extent. But since the instant documents are completely exempted by

§ 552(a)(2)(C) reliance upon exemptions (B)(2) and (5) is not necessary and their interpretation need not be repeated. *See id.,* at —— – ——, ——— . —— of 192 U.S. App.D.C., at 723–725, 732–734 of 591 F.2d. As to exemption (b)(7), its discussion in *Ginsburg, id.* at ——————— of 192 U.S.App.D.C., at 731–732 of 591 F.2d, is not applicable here because of the difference in the nature of the documents requested.

With respect to Exemption 7, *Ginsburg* did not rely thereon as an additional basis for not requiring disclosure, but instead addressed (b)(7) merely as exemplary of the scheme and general intent of the Act. *See id.,* at note 27 and accompanying text. While (b)(7) may have a stronger influence here it also has much the same significance that it occupied with respect to the Ginsburg records. Subsection (b)(7)(E) plainly indicates an intent to protect "investigative techniques and procedures" in law enforcement investigatory records. That being its intent it would hardly be sensible to attribute a contradictory intent to Congress to protect such procedures in investigatory documents and not in more general instructions to prosecutors. While this provision is not aimed directly at exempting prosecution instructions or manuals, except as the prosecuting instructions might be a part of investigatory records, it certainly is another instance where the Senate and the House agreed by specific language that both Houses intended to exempt law enforcement records that disclose investigative procedures. Prosecutorial instructions which specify offenses that should and should not be prosecuted constitute a significant part of "law enforcement . . . investigative . . procedures."

The majority opinion, however, refuses to discuss (b)(7) because it is asserted that the "claim was not timely made by the Department [of Justice], and consequently there is no need to consider its merits." Wilkey, J.,

Opinion at —— of 192 U.S.App.D.C., at 779 of 591 F.2d. The majority opinion further states:

> To meet [its] burden the agency must identify the *specific statutory exemption* relied upon and demonstrate that the exemption applies to the documents in question. This showing must be made *at the district court level.* An agency cannot prevail on an exemption that it has not raised either at the agency level or in the district court and that it has invoked for the first time in the appellate court. . . [I]ssues on appeal are to be confined to those duly presented to the trial court.

Maj. Op., at pp. ——, —— of 192 U.S.App. D.C., at p. 779 of 591 F.2d. The majority opinion then engages in an extraneous discussion of situations where an issue is raised for the first time on appeal. This is almost complete dicta but it ends up by admitting, somewhat reluctantly, that appellate courts have some limited discretion particularly because of 28 U.S.C. § 2106.[6]

In my opinion the rule is not as restrictive or limited as the majority opinion states. To my mind on an appeal in a civil case from a district court there is a considerable discretion vested in the appellate court which may vary dependent upon the nature of the issue, the nature of the new authority and to a considerable extent upon the certainty to which the issue may be resolved. If the issue requires the presentation of facts which were not developed below, or seeks to give a new ground for relief unrelated to the argument in the trial court or to *raise a new cause of action,* as was the case in *Doe v. McMillan,* 148 U.S. App.D.C. 280, 287, n.10, 459 F.2d 1304, 1311 n.10 (1972), *reversed on other grounds,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *see Ginsburg, supra,* at note 34, or involves an administrative proceeding where the agency must explicate the

---

**6.** 28 U.S.C. § 2106 provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

grounds for its action, *see Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943), then the ability of an appellate court is necessarily restricted. But the rule is not absolute and 28 U.S.C § 2106, *supra*, recognizes this. Realizing that it is well-settled that a correct decision in a lower court must be affirmed even though the lower court relied upon a wrong ground or gave a wrong reason, *Chenery, supra*, at 88, 63 S.Ct. 454; *Ryerson v. United States*, 312 U.S. 405, 408, 61 S.Ct. 656, 85 L.Ed. 917 (1941); *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937), it is clear that in appropriate cases parties may "urge . . . reasons for affirming the judgment of the District Court which may not have been relied upon by the District Court." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 71, 94 S.Ct. 1494, 1522, 39 L.Ed.2d 812 (1974). Indeed, courts can even consider new issues or grounds to prevent injustice under certain circumstances. *Hormel v. Helvering*, 312 U.S. 552, 556–57, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); *Morgan v. Garris*, 113 U.S.App.D.C. 222, 223–24, 307 F.2d 179, 180–81 (1962) (*en banc*).

Thus, when a matter first presented on appeal is in the nature of additional support resulting from further research for a point already raised, or results as the majority recognizes "because of an interim development in applicable legal doctrine," Maj. Op. p. —— of 192 U.S.App.D.C., at p. 780 of 591 F.2d (which is just this case with respect to Exemption 7) more latitude in considering the new ground is generally recognized to exist. Not recognizing this flexibility would amount to ignoring the authority given appellate courts by 28 U.S.C. § 2106, to "require such further proceedings to be had as may be just under the circumstances." I dissent from the majority's declaration that the law on the subject is as positively prohibitory as is indicated by its statement in the foregoing opinion, Maj. Op., pp. —— – —— of 192 U.S.App.D.C., at pp. 779–780 of 591 F.2d.

What happened here, and it must be presumed to happen in many FOIA cases, is that when the application was first made the agency denied it upon a single ground that it considered to be plain and determinative. With the tremendous quantity of FOIA cases that are developing I could not find a failure to file a completely exhaustive response to be unreasonable. There certainly is a great economy of time in so acting and not requiring that the statute and the decisions be fine combed to discover and assert every conceivable supporting authority. Doubtlessly the single ground is determinative of a great many requests. The same situation, and somewhat the same justification, develops to a lesser degree before the district court, particularly when the agency feels it has asserted conclusive legal authority for its action. The Agency may then see no necessity for asserting every cumulative authority. However, when its basis of decision is found to be insufficient and an appeal is necessary to this court it then feels it is necessary to marshall all its authority. That is how these situations arise and I feel that they should be dealt with realistically and where the new ground is raised because of a new decision, and same can be considered on the existing factual record made before the district court, I see no necessity, barring some other motivating consideration, to remand the case or to refuse to consider the legal authority so raised. In this case the Exemption 7 issue was raised because of our panel decision in *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 192 U.S.App.D.C. ——, 591 F.2d 717 (1978), which is today affirmed *en banc* by an equally divided court.

However, where a new cause of action is sought to be raised for the first time on appeal, as appellants attempted before our court in *Doe v. McMillan*, 148 U.S.App.D.C. 280, 284 & n.10, 459 F.2d 1304, 1308 & n.10 (1972), *rev'd on other grounds*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), an appellate court obviously should refuse to consider it. Our opinion in *Doe* does not support the contention for which it is cited by the majority.

It is thus my view that since the Government did raise Exemption 7 in its original

brief, Govt. Br., pp. 15–16, and expanded its reliance in its supplemental brief, Govt. Supp. Br., pp. 3–5, and no new factual findings are necessary to our consideration of its effect, that the majority opinion should consider it since in the majority's view of the case the applicability of the exemptions was determinative.

However, regardless of what the majority does with the 7th exemption, it is my view that the majority opinion excessively limits the discretion that the courts of appeals and the Supreme Court may exercise with respect to considering authorities that are delayed in presentation but still may determine a controversy or furnish a basis for or influence a decision. In my view the majority opinion in this respect is far too dogmatic and in that excess of zeal and certainty of its own opinion it has actually blinded itself so that it cannot see that in this very case it has committed the very vice it railes against.

The complaint here in *Jordan* is based *solely* upon the claim that § 552(a)(2)(B) and (C) entitle plaintiff to the relief he requests. App. 6. Jordan argued his case on that basis. App. 53, 52–58. And the Order and Judgment of the District Court is based *solely* upon § 552(a)(2)(B) and (C). App. 76–77. Furthermore, in this court the majority agree that *Jordan* and the district court were in error in claiming and holding that (a)(2) required access to the requested records. This error is articulated by the majority opinion as follows:

> In sum, then, we hold that the Manual and Guidelines sought by appellee Jordan in this case *are not* releasable under paragraph (a)(2) of the Act.

Maj. Op., p. --- of 192 U.S.App.D.C. at p. 763 of 591 F.2d (emphasis in original).

Then, in the very next sentence the majority proceeded to insert *for the first time in this case* a basis for decision that was never referred to in the pleadings, never discussed by either party in oral argument before the district court, never referred to or relied upon by the judgment of the district court, never referred to in any briefs to this court and never mentioned by either party in oral argument before this court *en banc.* Nevertheless, the next line of the majority opinion *for the first time* interjected a new theory for disclosure based on another subsection of the act, saying:

> However, these documents *are* releasable under paragraph (a)(3), unless they fall within at least one of the nine exemptions set forth in subsection (b).

Maj. Op., p. --- of 192 U.S.App.D.C. at p. 763 of 591 F.2d (emphasis in original). And it is upon the basis of subsection (a)(3) that the majority bases its decision that the records in question are disclosable notwithstanding its conclusion that they are exempted by (a)(2), the *only* subsection previously relied upon or discussed in the entire case. Thus, apart from its erroneous construction of (a)(3), which is pointed out above, the majority also violates its own pronouncement in considering and relying upon a section of the statute, and a theory for its construction, that had never previously been raised by anyone—anywhere. If the construction so belatedly advanced were sound, this contradiction of its announced principle which would preclude consideration of exemption 7 might have some justification, but, violating as it does sound rules of statutory construction it is in error in that respect as well as contrary to the majority's extravagant dicta which would unreasonably restrict appellate consideration strictly to matters and authority raised at the hearing stage. Actually, consideration of exemption 7 which was first mentioned by appellants in their initial brief would be a far lesser violation of the rule limiting appellee consideration as announced by the majority than the majority's interjection of subsection (a)(3) which never appeared in this case until the majority opinion was circulated.

### 4. The Sunshine Act.

Before proceeding with the discussion of the subject it should be noted that by interjecting the Sunshine Act argument the majority is interjecting this argument in its opinion for the first time in the case, contrary to the earlier condemnation of such procedure.

The claim of the majority in this respect is that an isolated provision of the Government in the Sunshine Act, P.L. 94–409, 90 Stat. 1241 (Sept. 13, 1976) supports its asserted construction of subsection (b)(2) of the Freedom of Information Act. Maj. Op. pp. ———–—— of 192 U.S.App.D.C., at pp. 770–771 of 591 F.2d. This claim is refuted by the opinion in *Ginsburg, supra,* at pp. ———–—— of 192 U.S.App.D.C., at pp. 734–735 of 591 F.2d. The basic error committed by the foregoing opinion, in its assertion that the Sunshine Act supports its construction, is that it fails to recognize that a different provision, § 552b(c)(7) of the Sunshine Act, accomplishes practically the same exemption that the House did through its Committee Report with respect to Exemption 2 of the FOIA. The specific language in the Sunshine Act that tracks the statement of intent of the House Committee Report with respect to Exemption 2 of the FOIA provides that any agency need not—

(7) disclose investigatory records compiled for law enforcement purposes, or information which if written would be contained in such records, but only to the extent that the production of such records or information would (A) interfere with enforcement proceedings, . . .

5 U.S.C. § 552b(c)(7). Written or oral instructions to investigators are a part of the "investigatory record" and it is too clear for argument that disclosure of prosecutorial instructions announcing that some violations might be prosecuted and others might not would certainly interfere with enforcement proceedings. These instructions are thus exempted by Exemption (7) of the Sunshine Act the same as they are by the Exemption (2) of the FOIA. But this case does not involve a Sunshine Act claim. The prosecution instructions also fall in the category of "guidelines . . . for Government investigators" that are exempted by § 552(b)(2) as explained by the House Report to the FOIA. *See Ginsburg,* at —— of 192 U.S.App.D.C., at 723 of 591 F.2d.

It is also a gross mistake for the majority opinion at ———–—— of 192 U.S.App.D.C., at 767–768 of 591 F.2d to overlook the fact

that the House Committee Report, in expressing its intent with respect to Exemption 2 did *not* expand that exemption but generally *restricted* what might have been held to be exempted by "practices of an agency." If one were to look *only* to the Senate Committee Report as the majority urge, "practices of an agency" might have been construed as including "matters of internal management." *Ginsburg, supra,* at ———–—— of 192 U.S.App.D.C., at 726 of 591 F.2d. Thus, the House Committee Report actually closed a potentially large loophole when it stated that its intent in Exemption 2 was to exempt from disclosure "operating rules, guidelines, and manuals of procedure for government investigators or examiners . . . " H.R. Rep.No.1497, 89th Cong., 2d Sess. 10 U.S. Code Cong. & Admin.News 1966, p. 2427 (May 9, 1966) (footnote omitted).

It is also fatal to the argument advanced by the majority with respect to (b)(2) and the Sunshine Act that substantially the same exemption from disclosure, as the Government asserts, had been expressed earlier in the Committee Reports on the FOIA by *both houses.* The Senate Report had stated:

The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters *rather than to law enforcement matters* protects the traditional confidential nature of instructions to Government personnel prosecuting violations of law in court, while permitting a public examination of the basis for administrative action.

S.Rep.No.813, 89th Cong., 1st Sess. 2, 7 (1965) (emphasis added). (See also p. —— of 192 U.S.App.D.C., pp. 786–787 of 591 F.2d, *supra.*) The House Report had expressed a similar intent:

*Furthermore, an agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines for the staff in auditing or inspection procedures, or in the selection or handling of cases,*

*such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases.*

H.R.Rep.No.1497, 89th Cong., 2d Sess. 7–8 (1966) U.S.Code Cong. & Admin.News 1966, pp. 2424–2425 (emphasis added). (See also pp. —— – —— of 192 U.S.App.D.C., pp. 787–788 of 591 F.2d, *supra.*) Jordan cannot overcome these expressions of legislative intent. Try as the majority may to inject some dispute between the two houses, or some deficiency in the expression of legislative intent, the two quotations above indicate their concurrence in exempting prosecution guidelines in law enforcement matters.

5. *The Unsupported Charge by the Majority Opinion of "Chicanery" by the House Committee on Interstate and Foreign Commerce.*

The majority opinion charges the House Committee on Interstate and Foreign Commerce (which was spearheaded by Representative Moss) with "chicanery" in attempting to inject improper congressional intent into the Senate bill through the House Committee Report. Time and space do not permit refutation of that charge except insofar as it may be relevant to this case—*i. e.,* to Exemption 2.

When the bill reached the House from the Senate, the Senate Committee Report with respect to Exemption 2 only gave a few "[e]xamples" of the types of *"rules"* it was *exempting from disclosure.* It made no reference to the "practices of an agency." Thus, if no further committee explanation of Exemption 2 were given the "practices of an agency" would be wide open to be given their normal meaning and that might be held to constitute a very *broad exemption.* It might even be deemed to cover "matters of internal management" as the Act previously provided. However, one of the principal purposes of the bill was to repeal the "internal management" exemption which was a feature of the then existing law. "Practices of an agency" would also cover *investigatory practices* and many other practices, and *all practices* would be exempt from disclosure unless some limita-

tion were placed on the statutory language. This was the possible construction that had crept into the bill when it reached the House.

Thus, because the Senate Committee Report left the "practices of an agency" part of the Exemption open to a very broad interpretation, which admittedly none of the authors ever intended, the House Committee Report went ahead and severely and specifically limited the breadth of the Exemption practically to operating rules, guidelines and *investigatory manuals.* It also further *restricted* the Exemption by providing that specific "matters of internal management" such as "employee relations and working conditions and routine administrative procedures" *must be disclosed.* The majority opinion mistakenly views this House action as broadening the Exemption. In reality the House Report closed a big loophole as is shown at pages —— – —— of 192 U.S.App.D.C., at pages 792–793 of 591 F.2d, *supra.* With respect to investigatory manuals it did nothing more than state the precise intent elsewhere stated by the Committee Reports in both the Senate and House with respect to administrative staff manuals, *i. e.,* to exempt law enforcement matters and staff manuals and instructions which set forth criteria or guidelines for the staff in the handling of cases such as criteria for prosecution of cases (*Ginsburg, supra* at pp. —— – —— of 192 U.S.App.D.C., at p. 719 of 591 F.2d). And as to "matters of internal management" there is no disagreement that both Houses intended to repeal that existing statutory exemption. Thus, the House Report did a more workmanlike job in setting forth the admitted intent of both Houses on Exemption 2.

As to the charge of "chicanery" with respect to Exemption 2 the open proceedings in Congress completely belie the accusation. First, Congressman Moss, the principal House author of the bill and the acknowledged father of the Freedom of Information Act, stated *publicly* on the very first day of the House hearings, March 30, 1965, that the intent of Exemption 2 was to exempt operating rules, guidelines and certain

manuals of procedure. Second, Congressman Moss publicly declared the same day that he would "hope to see a way of doing the job [exempting examiners' manuals] without exempting internal rules and practices." In the same vein Congressman Moss added, "we are perfectly willing to work at it." House Hearings, March 30, 1965, pp. 29–30. Third, the Senate hearings did not begin until May 14th, some six weeks later, and all the public House Committee proceedings were available to it. The Senate Committee Report was not filed until October 4, 1965.

Thus, no person can contend that something deceitful was being done with respect to Exemption 2 when the House subsequently did *precisely* what the principal author of the bill publicly stated they intended to "work at." Nor can it be contended that the Senate did not have ample opportunity to be informed of the House position.

Fourth, the charge made in *Ginsburg, supra* (*see* Dissent at —— of 192 U.S. App.D.C., at 746 of 591 F.2d) that there was some sinister "*last minute chicanery* by interested members of the House . . . just as the full committee in the House was about to report out the bill. . . ." (emphasis added), insofar as said charge is made with respect to Exemption 2, is flawed by the fact that committee reports are usually prepared near the final stage of a bill's passage. In view of the public statement of Congressman Moss made on March 30, 1965, over 13 months before the House Committee Report was filed on May 9, 1966 (H.Rep.No.1497, 89th Cong., 2d Sess. U.S.Code Cong. & Admin. News 1966, p. 2418), it cannot be contended that the portion of the report dealing with Exemption 2 constituted "last minute chicanery."

6. *Miscellaneous Comments.*

(a) The majority opinion states that several witnesses told the Senate, meaning the Senate subcommittee, that the exemptions would have to be expanded if it was desired to "protect investigative manuals." *See* Maj. Op., at —— of 192 U.S.App.D.C., at 766 of 591 F.2d. None of these witnesses were Senators and their statements do not constitute expressions of congressional intent. The statements referred to are also greatly weakened as to any possible weight by the fact that they were made on May 12, 14, and 21 in 1965 *before* the Senate Committee Report was filed on October 4, 1965. They thus have little or no force. Their comments are entitled to *no weight whatsoever* as expressions of legislative intent of the Senate. Similarly, those comments in the House Hearings which were "off the top of [the] heads" of certain participants, not members of the House, are similarly not reflective of congressional intent.

(b) The majority opinion cites certain passages from *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1593, 48 L.Ed.2d 11 (1976), but the significant feature of that opinion is that it leaves open for future decision the fate of a claim under the FOIA "where disclosure may risk circumvention of agency regulation." 425 U.S. at 369, 96 S.Ct. at 1603. While the prosecution instructions here do not present the same clear-cut case as is presented by *Ginsburg*, the facts here are sufficiently similar to conclude that the question here is also open. *See* concurring opinion of Judge Leventhal.

(c) The statement of the majority opinion at —— of 192 U.S.App.D.C., at 775 of 591 F.2d that "[n]either the Manual nor the [FOT] Guidelines . . . sought by appellee . . . were . . . even prepared in anticipation of trials in general" seems to be patently incorrect.

(d) In conclusion, I state my agreement with the statement in Judge Leventhal's opinion that:

Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation. [Leventhal, J., at —— of 192 U.S.App.D.C., at 783 of 591 F.2d].

I also join his statement as to the relationship of the House and Senate Reports and as to Justice Brennan's interpretation thereof. *Id.*, pp. —— – —— of 192 U.S.App. D.C., at 783–784 of 591 F.2d. I do not particularly reach his discussion of Exemption 2 because I find the prosecution instructions exempt from disclosure by the clear legislative intent of (a)(2) as expressed by both the Senate and the House.

(e) In my view, the majority opinion casts the statute and the issues here in a static mold and attempts to fit the facts of this case into a stereotype pattern that is contrary to both the character of the records here sought and the provisions of the statute and legislative history that applies thereto. What the majority opinion really does is rely solely on its insensitive construction of the bare language of the statute and ignore completely *all* congressional intent specifically expressed in the committee reports except for a monetary recognition of the intent expressed with respect to § (a)(2), which the opinion immediately negates.

To the extent expressed above I respectfully dissent from the majority opinion. Judge Robb joins in the foregoing opinion.